ROBERT GREEN & others *vs.* BOARD OF APPEAL OF
NORWOOD & others.

Norfolk.   October 7, 1970. — November 4, 1970.

Present: SPALDING, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Zoning,* Amendment of ordinance or by-law; Plan approved under subdivision control law; Size of lots; Height restriction; Multiple dwelling; Board of appeals: jurisdiction, appeal to board; Enforcement of zoning. *Subdivision Control. Equity Pleading and Practice,* Appeal. *Building. Permit. Inland Waters. Words,* "Dwelling."

In a suit in equity by way of appeal from a decision of the zoning board of appeal of a town ordering revocation of building permits issued for the plaintiffs' land, a contention that failure to comply with procedural requirements of G. L. c. 40A, § 7A, as amended, deprived the plaintiffs of the protection afforded thereby against a zoning by-law amendment adopted after approval of a definitive subdivision plan of their land by the town planning board could not be made for the first time in this court. [257]

Under a zoning by-law providing that in a general residence district of the town no dwelling should be constructed on a lot having an area less than "2 acres and not less than 4000 sq. ft. per dwelling unit for all units on the lot in buildings for 3 or more families," the area specifications meant that, for buildings for three or more families, each lot must be at least two acres in size and for each dwelling unit on the lot there must be at least four thousand square feet, not that the size of each lot must be at least two acres plus four thousand square feet for each dwelling unit. [258]

Under a zoning by-law permitting two story dwellings in general residence districts of the town for occupancy by three or more families and providing that the term "dwelling" included an "attached house" in which the dwelling units were side by side, separated by a wall, and an "apartment house," in which each dwelling unit was in whole or

in part over or under another unit "and/or" shared a common entrance with another unit, and with respect to two proposed two story buildings, each of which had one roof and one foundation, and each of which had several sections, it was held that each proposed building constituted a single dwelling within a provision of the by-law that "no lot in any district shall be occupied by more than one dwelling," and that on the evidence each proposed building was permissible in such a district. [259–260]

Certain alleged misrepresentations by the owners of land in their applications for building permits did not provide any basis for revocation of the permits. [260–261]

In a suit in equity under G. L. c. 40A, § 21, by way of appeal from a decision of the zoning board of appeal of a town ordering revocation of building permits issued for the plaintiffs' land, where it appeared that a predecessor in title of the plaintiffs had made an agreement with the planning board that the cellar floor of a proposed building on the land would be one foot above the finished grade of the adjacent street, that a recorded definitive subdivision plan of the land approved by the planning board under c. 41, §§ 81K–81GG, shortly thereafter did not have the agreement inscribed on it or refer to any separate document containing the agreement, and that the plaintiffs did not know of the agreement when they purchased the land or until the permits were issued to them about three years after the agreement was made, it was held that noncompliance with the agreement provided no basis upon which the board of appeal could order revocation of the permits. [261–263]

Under provisions of the zoning by-law of a town prohibiting construction of buildings in excess of thirty feet high in general residence districts and providing that height should "be measured vertically from the average finished grade of the ground adjoining a building . . . to the highest point on the roof," this court, upon the evidence and its interpretation of architect's plans, concluded that neither of two proposed buildings would violate the height restriction. [263]

Enforcement of an order of the State Department of Natural Resources issued in 1966 under G. L. c. 131, § 117C, requiring certain action on land upon which a developer proposed the construction of buildings could not lawfully be accomplished through revocation of building permits for the land ordered by the town zoning board of appeal upon an appeal under c. 40A, § 13, from the issuance of the permits by the building inspector. [263–264]

A condition of approval indorsed on a definitive subdivision plan of a tract of land by the planning board of a town, that no lot "within" the subdivision should be sold until completion of certain improvements on the land, was not violated by sale of the tract as a whole by one developer to another before completion of such improvements. [264]

BILL IN EQUITY filed in the Superior Court on August 16, 1968.

The suit was heard by *Smith,* J.

*Sumner H. Babcock* (*Henry S. Healy* with him) for the plaintiffs.

*Justin C. Barton* for the defendants Aspell, and for Peter A. Alessi & others, interveners.

*Walter J. Gotovich,* Town Counsel, for the Board of Appeal of Norwood, joined in a brief.

CUTTER, J. On April 3, 1968, the plaintiffs, doing business as Norwood Gardens (Gardens), were given permits to construct buildings on land (the locus) in Norwood. The locus was in a G district (i.e. zoned for general residence use) when a definitive subdivision plan of the locus was approved on March 29, 1965. On December 20, 1965, at a special town meeting, the locus was rezoned for a single residence use.

Permit no. 9949 (for building no. 2) covered lots 838 to 840, inclusive, shown on the plan and related to forty-four units. The total area of these lots is 176,006 square feet. Permit no. 9950 (for building no. 3) dealt with lots 820 to 827, inclusive. These lots contain 217,690 square feet. The permit was for fifty-four units.[1]

After the permits were issued, land was graded, water and sewer facilities were installed, and storm drains and foundations were provided, at a cost of about $350,000. A total expenditure of $6,000,000 is proposed.

James J. and Constance Aspell (the Aspells), also defendants in this proceeding, appealed from the action of the building inspector in granting permits nos. 9949 and 9950. The board of appeal, after hearing, voted to request the selectmen to revoke the permits.

Gardens then brought the present bill in equity under G. L. c. 40A, § 21 (as amended through St. 1960, c. 365; see later amendments through St. 1970, c. 80). The bill seeks a determination that the board of appeal exceeded its

---

[1] The permits, by mistake, were issued to Norwood Gardens, Inc. This was corrected and the individual plaintiffs, doing business as Norwood Gardens, were designated. The plaintiffs were recognized as owners by the board of appeal in subsequent proceedings. See part 4 (a) of this opinion.

authority in reversing the action of the building inspector. The trial judge, in voluntary findings, in effect stated the facts set forth above and made a few independent findings, which (so far as now important) are mentioned below. He then made a somewhat ambiguous summary or quotation of the decision of the board of appeal. We assume that he intended thereby to adopt some of the board's findings as his own, although he appropriately should have made independent findings after a hearing de novo.[2] A final decree was entered that no modification of the board's decision was required. Gardens appealed.

The evidence is reported. The trial judge adopted his voluntary findings as his report of material facts. See *Selig* v. *Wexler,* 355 Mass. 671, 672.

1. The trial judge correctly ruled that the locus is governed by the 1963 zoning by-law in effect at all times from January 18, 1963, until after March 29, 1965, when the definitive subdivision plan was approved. See G. L. c. 40A, § 7A (as amended through St. 1964, c. 688; see later amendments through St. 1965, c. 366, §§ 1, 2).[3] See also *Doliner* v. *Planning Bd. of Millis,* 349 Mass. 691, 696–697; *McCarthy* v. *Board of Appeals of Ashland,* 354 Mass. 660, 661–663. Ac-

---

[2] In an appeal under c. 40A, § 21, the decision of the board of appeal cannot be the basis of the court's decision. *Devine* v. *Zoning Bd. of Appeals of Lynn,* 332 Mass. 319, 321–322. See *Cullen* v. *Building Inspector of No. Attleborough,* 353 Mass. 671, 680.

[3] Section 7A reads in part, "When a preliminary plan . . . [see c. 41, § 81S] has been submitted to a planning board, and written notice of the submission of such plan has been given to the . . . town clerk, the land shown on such preliminary plan and on the definitive plan evolved therefrom, or in the absence of a preliminary plan, the land shown on a definitive plan submitted under the provisions of the subdivision control law, shall be governed by applicable provisions of the zoning . . . by-law in effect at the time of submission of the plan first submitted while such plan or plans are being processed under said subdivision control law; and, if said definitive plan becomes approved . . . said provisions of the . . . by-law in effect at the time of the submission of the first submitted plan shall govern the land shown on such approved definitive plan for a period of five years from the date of endorsement of such approval notwithstanding any other provision of law; provided, that if a preliminary plan is submitted, the definitive plan is duly submitted within seven months from the date on which the preliminary plan was submitted." Although counsel for Gardens stated in his opening that a preliminary subdivision plan was filed in February, 1964, and a definitive plan was filed on June 23, 1964, these matters do not appear to have been brought out in evidence. See, as to the effect of amendments of § 7A, *Building Inspector of Acton* v. *Board of Appeals of Acton,* 348 Mass. 453, 455–457.

cordingly, if Gardens' project complied with the 1963 zoning by-law, Gardens was entitled (so far as § 7A is concerned) to the permits which it sought.

The Aspells contend that Gardens gains no protection from § 7A because there is no proof that the definitive plan was submitted within seven months of the filing of a preliminary plan (fn. 3), even though Gardens now seeks no protection against any amendment of the zoning by-law occurring before the approval of the definitive plan. The judge adopted the board's conclusion "that protection does accrue [to Gardens] under . . . [§] 7A." This conclusion implies a finding (warranted by stipulations concerning the definitive subdivision plan and by the absence of dispute before him concerning the proceedings leading to that plan's approval) that there had been compliance with procedural requirements for obtaining protection under § 7A. In the circumstances, such issues should not be raised for the first time in this court. See *Henchey* v. *Cox*, 348 Mass. 742, 747. We thus need not decide whether, in any event, approval of the definitive subdivision plan gave Gardens protection under § 7A against any amendment of the zoning by-law occurring after such approval, even if more than seven months elapsed between the date on which a preliminary plan was filed and the filing of the definitive plan.[4]

2. Section 11, par. A, of the applicable Norwood zoning by-law provides, "No dwelling shall be constructed . . . on a lot having less frontage . . . or less area" than speci-

---

[4] The Aspells' argument rests on a literal reading of § 7A, especially the proviso at the end of the portion quoted in fn. 3. Gardens, however, suggests that the "purpose of the seven-month[s] . . . limit is to make sure that an undue period does not pass during which zoning changes may take place [from which a developer may receive seven years of protection], between the filing of the preliminary plan and the filing of the definitive plan." This interpretation of the proviso by Gardens would mean, in effect, that any definitive plan, filed more than seven months after a preceding preliminary plan, is to be treated as a new plan, which gains protection under § 7A only from the date when it is filed and not as of the date of the filing of the preliminary plan. No substantial reason appears for any legislative intention that the proviso should preclude protection under § 7A from zoning amendments effective only after approval of a definitive plan. The effect and purpose of the ambiguous proviso, with respect to the issue argued, were not decided in *Paul Livoli, Inc.* v. *Planning Bd. of Marlborough*, 347 Mass. 330, 334–335.

fied in Table B attached to § 11. In a G district, Table B (as in effect on March 29, 1965) states the required lot area to be "2 acres *and* not less than 4000 sq. ft. per dwelling unit for all units on the lot in buildings for 3 or more families" (emphasis supplied).

The Aspells contend that the italicized "and" makes the space requirement for multi-unit buildings in effect a minimum of two acres plus an additional 4,000 square feet for each dwelling unit. As an example, they suggest that the "area required . . . for . . . permit [n]o. 9949 is 263,120 square feet . . . (*i.e.* 2 × 43,560 square feet and 44 × 4000 square feet = 263,120)." They point out that Gardens had only 176,006 square feet for the proposed building covered by the permit.

Although the by-law is not wholly clear, the reasonable interpretation[5] is that, for buildings for three or more families, (a) the lot must be at least two acres in size and (b) for each dwelling unit on the lot there must be at least 4,000 square feet. The consequence would be that on a two acre lot (87,120 square feet) there could be twenty-one dwelling units. The area covered by building no. 2 (176,006 square feet) would permit (at 4,000 square feet a dwelling unit) forty-four units. In the case of the building covered by permit no. 9950, with an area of 217,690 square feet, there could be fifty-four dwelling units.

Zoning by-laws must be construed reasonably. See *Petros* v. *Superintendent of Bldgs. of Lynn,* 306 Mass. 368, 371; *Haynes* v. *Grasso,* 353 Mass. 731, 734, and cases cited. As in the case of other legislative provisions, such by-laws should not be so interpreted as to cause absurd or unreasonable results when the language is susceptible of a sensible meaning. Here, however, we need not rely solely on such general canons of construction, for in another part of Table

[5] The interpretation contended for by the Aspells would mean that for four dwelling units, there must be two acres, 87,120 square feet, plus 16,000 square feet (4,000 square feet for each unit), a total of 103,120 square feet or 25,780 square feet for each unit. Even in a single residence (S2) district, Table B requires only 15,000 square feet for each dwelling unit.

B, the by-law uses different and clear language[6] when the purpose is to reach the result for which the Aspells contend. The different usage supports our conclusion, as does a decision of the Land Court (August 27, 1969, in *Clark* v. *Norwood*, Misc. No. 55,529) with respect to which no appeal has been perfected. Gardens, in an appendix to its brief, has brought this decision to our attention.,

3. Section 14 of the by-law provides in par. B, "Except in the case of authorized group projects, no lot in any district shall be occupied by more than one dwelling." Section 4, par. A, provides that (with exceptions not pertinent) "no building . . . or land shall be used . . . for any purpose other than for one or more of the uses set forth in Table A as permitted in the district in which such building . . . or land is located." Table A, Use Item A4 (as in effect on March 29, 1965), indicates that in a G district, the term "dwelling" or "dwellings" includes a "[b]uilding for occupancy by a total of three or more families including an 'attached house' (in which the dwelling units are side by side, separated by a wall) and an 'apartment house' (in which each dwelling unit is in whole or in part over or under another unit, and/or [*sic*] shares a common entrance with another unit); provided that in a G [general residence] district, no full dwelling unit shall be above the second floor."

Each building proposed by Gardens has one roof and one foundation and is two stories high (so that no full dwelling unit is above the second floor). One of the buildings (building no. 2) has four attached segments or sections containing apartments or dwelling units. The other building (building no. 3) has seven such segments or sections. Each dwelling unit is in whole or in part over or under another unit and

---

[6] The required lot area for an A (multi-family) district is "5000 sq. ft. for each dwelling unit in an attached house, double house or duplex house; 10,000 sq. ft. *plus an additional* 2500 sq. ft. per dwelling unit for all units in excess of one . . . on the lot for all other dwellings" (emphasis supplied). The italicized words were not used in stating the required lot area for G districts. There was evidence that, prior to the present case, on ten occasions, the Norwood authorities had construed the by-law provision as we do. See *Cleary* v. *Cardullo's, Inc.* 347 Mass. 337, 343–344. Cf. *Goldman* v. *Mahony,* 354 Mass. 705, 708.

shares a common entrance with another unit or units. On the same floor the dwelling units are side by side. The dwelling units are separated by walls. The segments or sections of each building also are thus separated. The building inspector testified as to building no. 2 that in his opinion it was "one building with fire walls between the sections to separate them for fire protection."

The Aspells argue that the structure covered by each permit constitutes a group of buildings subject to § 14 of the by-law dealing with "a group of two or more dwellings" and to the provisions of par. B of § 14, already quoted, that (with the exception noted earlier) "no lot in any district shall be occupied by more than one dwelling." Gardens, we think correctly, takes the position that, under this by-law, each building permit covers only a single building or dwelling, so that § 14 has no application because only a single building (or a part of a single building) will be on any lot. The provision in Table A, Use Item A4, quoted above, governing the multi-family dwellings permissible in G districts, is broad enough to include within the term "dwelling" single buildings containing sections or segments, each with several apartments or dwelling units, like those shown in the plans in the record. On the evidence, under the by-law, either building was permissible in a G district despite the arrangement of its sections or dwelling units.

4. The Aspells contend that Gardens in the applications for building permits made false representations. The alleged misrepresentations are discussed separately.

(a) An architect by inadvertence referred to the owner as Norwood Gardens, Inc. The mistake was promptly corrected. The board of appeal agreed that ownership had been established to its satisfaction. See fn. 1.

(b) References in the applications in 1968 to the area as a "GR" zone were not misrepresentations but were accurate. Because of c. 40A, § 7A, the December, 1965, rezoning did not become applicable to the locus. See part 1 of this opinion.

(c) In answer to a question, "Is land solid or filled," the

answer was "Solid." The word "Dry" was checked instead
of "Wet" immediately thereafter on each application form.
There was evidence of the excavation of peat on the locus,
of the use of fill, and that the locus was "wet." Much of
this evidence was somewhat general. The building inspector
went on the land during excavation before any pouring of
concrete was done. He found "[g]ood solid ground" with
"stable, unchanged earth at the bottom of the hole." A
little gravel fill was put in which "rolled down into a good
solid base." He testified that the area was "[w]et" but,
where "the building was going to be constructed," the area
"[t]his year . . . was dry, most of it." The evidence
strongly suggests that, in the circumstances, where opinions
thus differed, there was no material misrepresentation of
fact. The trial judge's conclusion that the applications
"were substantially conformable to the [b]uilding [c]ode"
was justified by the evidence. The alleged misrepresenta-
tions provide no basis for revocation of the permits.

5. The Aspells assert that the permits were properly re-
voked, because of either (a) specified inadequacies in the
plans or (b) Gardens' failure to comply with certain ad-
ministrative requirements.

(a) The Aspells rely upon an agreement by a letter dated
March 16, 1965, signed in behalf of a predecessor of Gardens,
that the cellar floor of the building on lots 838 and 839
would be one foot above the finished road grade of the adja-
cent street. The record shows no notation of this agreement
on the recorded subdivision plan approved March 29, 1965.
We accept as true the evidence that the individuals now
owning the Gardens project first learned of the agreement
of March 16, 1965, when the permits were issued to them;
that they had no knowledge of it (or of any conditions em-
bodying the agreement) prior to their purchase of the locus;
and that no such conditions or agreement appeared of record
in the registry of deeds. See G. L. c. 41, § 81X (as amended
through St. 1962, c. 313; see later amendments through
St. 1967, c. 248). See also § 81W (as inserted by St. 1953,
c. 674, § 7).

Various provisions of the subdivision control law indicate that such agreements (affecting plans) made with planning boards, or conditions on the approval of plans imposed by planning boards, to be effective as restraints upon the use of land by reason of the subdivision control law (at least as to purchasers of land covered by a subdivision plan without actual notice of the agreement or condition), must be either inscribed on the plan or contained in a separate document referred to on the plan. See G. L. c. 41, § 81U (as amended through St. 1964, c. 105, § 2; see later amendments by St. 1965, c. 62, and St. 1967, c. 567); § 81R (as amended through St. 1955, c. 411, § 1), stipulating limited matters (not here relevant) as to which a planning board may impose conditions; § 81Y (inserted by St. 1953, c. 674, § 7), as to the duty not to issue permits in violation of conditions indorsed on, or referred to in, a plan. See also *Ellen M. Gifford Sheltering Home Corp.* v. *Board of Appeals of Wayland,* 349 Mass. 292, 294.

No planning board "rule or regulation shall relate to the size, shape . . . or use of lots within a subdivision, or [with stated exceptions] *to the buildings* which may be constructed thereon" (emphasis supplied). See *McCarthy* v. *Board of Appeals of Ashland,* 354 Mass. 660, 662–663, quoting c. 41, § 81Q (as amended through St. 1960, c. 417; see later amendments by St. 1965, c. 64, and St. 1969, c. 884, § 3). We have been referred to no regulations imposing any requirement such as that on which the Aspells rely. See *Castle Estates, Inc.* v. *Park & Planning Bd. of Medfield,* 344 Mass. 329, 330–334. Prior decisions have discussed the legislative purpose to limit substantially the scope of permissible planning board action and regulations. See *Daley Constr. Co. Inc.* v. *Planning Bd. of Randolph,* 340 Mass. 149, 152–156; *Pieper* v. *Planning Bd. of Southborough,* 340 Mass. 157, 162–164. The subdivision control law found in c. 41, §§ 81K–81GG (at least in the absence of permissible, applicable regulations, see *Rounds* v. *Board of Water & Sewer Commrs. of Wilmington,* 347 Mass. 40, 45–47), does not extend to the imposition of conditions relating to the structural aspects of proposed

buildings or to other matters not noted, or referred to, on approved plans or by appropriate recorded plan modifications.[7] We hold that the agreement of March 16, 1965, provided no basis upon which the board of appeal could order revocation of the permits, and that, in the circumstances shown by the evidence, Gardens is protected from that agreement by the absence of any notation of it on, or reference to it in, the recorded plan.

(b) The Aspells contend that the plans (especially Sheet A–18–D–O) show that the buildings will exceed thirty feet, the maximum height allowed in a G district by § 15, par. A, Table E, of the zoning by-law. Section 15B provides that height is to "be measured vertically from the average finished grade of the ground adjoining a building . . . to the highest point on the roof." In its reply brief, Gardens argues that the plans, properly read, show a total height of only twenty-nine feet, five inches from ground to roof top. The detailed plans, read as a whole, although not completely clear, appear to confirm Gardens' analysis. In any event the elevations (Sheets A–202 and A–203–D–O) show that the roof is to be twenty-nine feet, six inches, above ground grade for building no. 2 covered by permit no. 9949. Scaling the elevation plan (Sheets A–302 and A–303–D–O) for building no. 3, covered by permit no. 9950, indicates an even lower height above ground level. As we read the plans and evidence, the board's decision (on the height of the two buildings), in effect adopted by the trial judge, is not justified.[8]

(c) The Aspells contend that Gardens' permits should

---

[7] It is to be noted also that review under G. L. c. 40A, § 13, of action by the building inspector (see *Bearce* v. *Zoning Bd. of Appeals of Brockton*, 351 Mass. 316, 319–320) relates only to his decisions "in violation of . . . *this chapter* [c. 40A] or any . . . by-law adopted thereunder" (emphasis supplied). A different remedy (a bill in equity in the Superior Court) is provided to deal with violations of a planning board order or condition imposed under the subdivision control law. See G. L. c. 41, § 81Y.

[8] Our decision of this aspect of the case rests on our interpretation of the architect's plans as providing for no part of either building more than thirty feet above the surface of the adjacent ground. Nothing in this decision shall preclude the building inspector from requiring Gardens to clarify its plans to make them clear on this point.

be revoked because of an order dated May 18, 1966, of the State Department of Natural Resources (apparently in answer to a notice from a developer, dated April 7, 1966). The order, addressed to a predecessor in title to the locus, required (see G. L. c. 131, § 117C, inserted by St. 1965, c. 220; later amended by St. 1966, c. 276, and also by St. 1967, c. 802, § 1, completely revising G. L. c. 131, and covering the subject matter of old § 117C in new § 40), certain action with respect to construction then proposed upon the locus. The evidence shows no notice of this order to the present owners of Gardens before they purchased the locus, although they did know of the order before commencing construction. The Superior Court, under new § 40, has jurisdiction in equity to enforce compliance with the section. One of the owners of Gardens testified that they intend to comply with this order before the project is completed. An agreement with the town covering street construction, drainage, water, and other matters, was executed by Gardens in 1968. The trial judge found that there had been compliance with this agreement. Since the project has not been completed, it cannot now be said that there will be violation of the 1966 order. In any event enforcement of the order is not to be accomplished by revocation of the permits as a result of an appeal under c. 40A, § 13. See the analogous situation in *Selectmen of Wrentham* v. *Monson*, 355 Mass. 715, 716–718. If there is occasion for enforcement of the order, resort may be had to the remedies provided by new § 40.

(d) There was no failure to comply with conditions indorsed on the subdivision plan with respect either to filing a bond or to the sale of lots. The bond was filed. The sale of the locus as a whole by one developer to another was not a violation of a provision, in the conditional approval of the subdivision plan, that "[n]o lot *within* [the] subdivision shall be sold" (emphasis supplied) until certain improvements should be completed.

(e) The plans and oral testimony show no proposed violation by Gardens, as to the building most readily to be served

by each particular parking space, of § 10D of the zoning by-law which requires that "the walking distance between the farthest point of the parking area and the main pedestrian entrance" shall not exceed 500 feet.[9]

(f) There was no failure to comply with G. L. c. 40, § 54 (inserted by St. 1965, c. 385, § 1), with respect to the availability of water. The trial judge found that water facilities "were installed."

6. Examination of the record shows that each ground for revoking the permit relied upon by the board of appeal or argued in this court by the Aspells was either without support in the evidence or erroneous as matter of law. Because, with the few exceptions noted in this opinion, the judge's findings merely adopt the reasons stated by the board of appeal, neither the decision of the board of appeal nor the final decree can stand.

7. The final decree is reversed. A new final decree is to be entered stating that the decision of the board of appeal is annulled as being in excess of its authority.

*So ordered.*

---

[9] It would be absurd to treat the driveway leading from the street to the parking space as a part of the parking space for the purpose of measuring distances under §§ 10D and 10F.