ROBERT MANNING & others[1] vs. BOSTON REDEVELOPMENT
AUTHORITY & others.[2]

Suffolk.   March 3, 1987. — July 10, 1987.

Present: HENNESSEY, C.J., NOLAN, LYNCH, & O'CONNOR, JJ.

*Boston Redevelopment Authority. Zoning,* Planned development area. *Statute,* Construction.

In a case challenging actions of the Boston Redevelopment Authority (BRA)
and of the Boston zoning commission which had resulted in the desig-
nation of a certain project site as a "planned development area" under
art. 3, § 3-1A, of the Boston Zoning Code, a contention by the plaintiffs
that, in the absence of a formal, articulated plan for the city, the project
failed to conform to "the general plan for the city as a whole," as required
by § 3-1A, was without merit where the requirement of § 3-1A was met
by evidence before the BRA sufficient to warrant a finding that the
project conformed to an informal plan evidenced by precedents of de-
velopment and extant zoning ordinances and concepts. [450-451]
In a proceeding in the Land Court challenging actions of the Boston Rede-
velopment Authority (BRA) and of the Boston zoning commission which
had resulted in the designation of a certain project as a "planned develop-
ment area" under art. 3, § 3-1A, of the Boston Zoning Code, the judge
properly construed § 3-1A in a way which placed on the BRA the
responsibility to weigh adverse effects of development projects against
their benefits, and then determine whether, on balance, the proposed
project would be injurious to the neighborhood or detrimental to the
public welfare. [452-454]
In a proceeding in the Land Court challenging actions of the Boston Rede-
velopment Authority (BRA) and of the Boston zoning commission which
had resulted in the designation of a certain project as a "planned develop-
ment area" under art. 3, § 3-1A, of the Boston Zoning Code, the judge

[1] Twenty-two individual Back Bay and Beacon Hill property owners, and
Citizens for a Better New England Life, Inc. Pamela Humphrey and ten
individual members of the Neighborhood Association of the Back Bay were
permitted to intervene as plaintiffs.

[2] The zoning commission of the city of Boston and the city of Boston.
New England Mutual Life Insurance Company, Inc., and Gerald D. Hines
Interests, Inc., were permitted to intervene as defendants.

did not err by not requiring the BRA to prescribe mechanisms by which some of the anticipated harmful effects of the project, such as "traffic statements and [rapid] transit breakdowns," might be alleviated. [454]

CIVIL ACTION commenced in the Land Court Department on September 11, 1985.

The case was heard by *Marilyn M. Sullivan, J.*

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Herbert P. Gleason (Thomas H. Martin* with him) for the plaintiffs.

*Stephen H. Oleskey* for New England Mutual Life Insurance Company, Inc., & another.

*Jane M. O'Malley,* Assistant Corporation Counsel, for the city of Boston & another.

*Adrienne M. Markham (Paul E. Burns* with her) for Boston Redevelopment Authority.

*Nicholas J. Palermo, Jr.,* for Seven Neighborhood Associations, amicus curiae, submitted a brief.

O'CONNOR, J. This case, like others preceding it, challenges the development of the 500 Boylston Street Project (project) in the Back Bay section of Boston. See *Manning* v. *New England Mut. Life Ins. Co.,* 399 Mass. 730 (1987); *Conservation Law Found.* v. *Director of the Div. of Water Pollution Control,* 22 Mass. App. Ct. 544 (1986). The plaintiffs appealed from a judgment of the Land Court upholding the actions of the Boston Redevelopment Authority (BRA) and of the Boston zoning commission resulting in the designation of the project site as a "planned development area" (PDA) under art. 3, § 3-1A, of the Boston Zoning Code.[3] We transferred the appeal to this court on our own motion. We affirm.

---

[3] Section 3-1A provides in pertinent part as follows: "Special Purpose Overlay Districts. A subdistrict or part thereof or a contiguous group of subdistricts or parts thereof may be designated as a special purpose overlay district as follows: (a) planned development area . . . .

"Planned Development Areas. The whole or any part of a subdistrict may be established as a planned development area if such area contains not less than one acre and the commission has received from the Boston Redevelop-

This case was heard together with an action commenced in the Superior Court appealing a decision of the zoning board of appeal of Boston granting certain conditional uses and exceptions that would permit the project to be constructed. Prior to the commencement of trial, the judge ruled that, with respect to the plaintiffs' challenge to the action of the BRA, review would not be by a de novo hearing, but rather would be limited

ment Authority, and has approved, a development plan or, if the area contains not less than five acres and is not located in a residential zoning district, a master plan for the development of the planned development area. Before transmittal to the commission, such development plan or master plan shall have been approved by said Authority after a public hearing, provided, however, that no development plan or master plan shall be approved by said Authority unless said Authority finds that such plan conforms to the general plan for the city as a whole and that nothing in such plan will be injurious to the neighborhood or otherwise detrimental to the public welfare. A development plan shall set forth the proposed location and appearance of structures, open spaces and landscaping, proposed uses of the area, densities, proposed traffic circulation, parking and loading facilities, access to public transportation, proposed dimensions of structures, and may include proposed building elevations, schematic layout drawings and exterior building materials, and such other matters as said Authority deems appropriate to its consideration of the proposed development of the area."

"To insure that no work proceeds other than in accordance with the development plan, no structure shall be erected, reconstructed, or structurally changed or extended in a planned development area, whether or not a master plan has been approved for such area, unless all drawings and specifications therefor shall have been subjected to design review and approved by said Authority. The Building Commissioner shall not issue any building or use permit with respect to any building, structure, or land within a planned development area unless the Director of said Authority has certified on the application therefor and on each and every plan filed with the Building Commissioner in connection therewith that the same is consistent with the development plan for such planned development area or the portion thereof to which said permit relates. Except as otherwise provided in Article 6A, planned development areas shall be subject to all the provisions of this code applicable to the subdistrict in which the area is located." (Inserted 1968, amended December 29, 1982.)

When a project site has been afforded PDA status, the developer may apply for exceptions from the zoning board of appeal. See Boston Zoning Code art. 3, § 3-1A, and art. 6A. The showing required for the grant of exceptions is less than that required for variances. Compare § 6A-3 (conditions required for an exception) with art. 7, § 7-3 (conditions required for variances).

to the record of proceedings before the BRA. The judge also ruled that the Superior Court case and that portion of the Land Court case challenging the action of the Boston zoning commission would be subject to de novo review. None of the parties objected below to those rulings on the scope of the judge's review.

No appeal has been taken from the judgment in the Superior Court case. The present appeal is confined to the Land Court case, and its principal thrust is to challenge the validity of the BRA's findings that the plan for the project "conforms to the general plan for the City as a whole," and that "nothing in such plan will be injurious to the neighborhood or otherwise detrimental to the public welfare." The plaintiffs' challenge to the Boston zoning commission's designation of the project as a PDA appears to be based entirely on the alleged infirmity of the BRA's findings and approval of the project.

Assisted by the judge's memorandum of decision, we set forth the undisputed background of this case. In November, 1982, the BRA solicited proposals for the development of a site bounded by Providence Street, Berkeley Street, St. James Avenue and Clarendon Street. The site was occupied by the St. James Avenue parking garage owned by the city. The defendants-interveners, New England Mutual Life Insurance Company Inc. (NEL), and Gerald D. Hines Interests, Inc. (Hines), submitted the only proposal for development of the site. The proposal envisioned a development that would encompass not only the St. James Avenue garage, but also NEL's adjoining property bounded by Providence, Berkeley, Clarendon, and Boylston streets. In February, 1983, NEL and Hines submitted the initial design for the proposed project to the BRA, and in June, the BRA executed a "Contract to Insure Community Participation By and Between Boston Redevelopment Authority and Organizations and Individuals Comprising the St. James Avenue Civic Advisory Committee." The purpose of the Civic Advisory Committee (CAC) was to insure community input into the design and environmental impact of the project, and its membership has included the Back Bay Architectural Commission, the Back Bay Association, the Back Bay

Federation, the Boston Society of Architects, the Neighborhood Association of the Back Bay, the Newbury Street League, the State Representative for the Eighth Suffolk District, Trinity Church, and the Ellis Neighborhood Association.

In December, 1983, the BRA designated NEL and Hines as the developer of the St. James Avenue site. In the ensuing months, the CAC and representatives of its constituent organizations met regularly with representatives of the BRA and the developer to discuss neighborhood concerns with the proposed building. These concerns included wind effects of the proposed high-rise structure, traffic impacts, and the design prepared for the developer by the New York architectural firm of John Burgee Associates with Philip Johnson.

The BRA and the developer have worked to accommodate the concerns of the CAC with respect to the design of the building, and have taken various mitigating measures in conjunction with the project. During the period from the submission of the initial design to the date of BRA approval, many changes were made in the project as part of the on-going dialogue between the developer, the BRA, and the CAC. The height of the building was lowered to twenty-five stories (from 396 to 330 feet) and twin towers proposed for the easterly section of the project were moved farther apart. As the building design changed, the ratio of the gross floor area to the total area of the lot (floor area ratio) was reduced from 11.5 to 9.5. Exterior loading bays on St. James Avenue have been eliminated; the building will be serviced entirely from within the tower section. The design now provides for retail shops in the St. James Avenue portion of the building. The detail of the design has been increased, and the color originally contemplated has been changed to a rosy shade of granite. Also increased were sidewalk widths and building setbacks, and the setback of the towers from the base of the structure.

In July, 1984, the CAC recommended BRA approval of the developer's schematic design for PDA designation of the project, subject to certain conditions. Some of its constituent organizations withheld support on the ground that concerns earlier expressed had not been addressed satisfactorily. In March,

1985, the BRA, after public hearings, approved the project site as a PDA and found, as required by § 3-1A of the Boston Zoning Code, that the project conformed to the general plan for the city as a whole and contained nothing injurious to the neighborhood or otherwise detrimental to the public welfare. BRA review of the project did not terminate with this approval, but has included, since that time, design development approval subject to resolution of certain issues, final designation of NEL and Hines as the developer, and approval of working drawings conditioned on further review.

After the BRA approved the project, it petitioned the Boston zoning commission for approval of the development plan and map amendment designating the project site as a PDA. After a public hearing, the commission voted to endorse the BRA approval, adding that it was concerned about traffic mitigating measures and that it "strongly support[ed] the addition of 270 off-street parking spaces to the 1000 spaces proposed."

The day following the commission vote, the zoning board of appeal held a public hearing to consider the developer's applications for conditional uses and exceptions to the Boston Zoning Code. These applications were granted, but the board of appeal, noting that the plans may be modified, required that final working drawings be submitted to the BRA for design review to insure consistency.

None of the parties argued below or argues here that the judge was incorrect in confining the scope of review of the BRA's findings to the administrative record. See *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 54 (1977); *Sherman* v. *Rent Control Bd. of Brookline*, 367 Mass. 1, 10 (1975). Accordingly, although the plaintiffs make numerous contentions in this appeal concerning perceived erroneous rulings and misstatements of law contained in the judge's decision, we address those contentions only in so far as they bear on the validity of the BRA's findings. The critical inquiry is not whether the judge misunderstood the law in various respects. Rather, the critical inquiry is whether the BRA's findings on which its approval of the project was based were infected by error.

We need not discuss the plaintiffs' contention that the judge erroneously concluded that the plaintiffs lack standing to contest the administrative agencies' actions. We assume, in the plaintiffs' favor, that they do have standing. Furthermore, we need not decide whether, in order to stand, the BRA's findings must only withstand a claim that they are arbitrary and capricious, as the judge concluded the test to be, or must meet a more rigorous substantial evidence standard, as the plaintiffs contend. The question is academic. None of the questions we address depends for its resolution on which standard of review is employed. There is no reference in any of the briefs filed in this court to the evidence before the BRA. The briefs discuss the evidence before the judge, but that evidence relates only to the judge's de novo review of the actions taken by the Boston zoning commission and the board of appeal, and is of no consequence here.

We address the plaintiffs' contention that the judge erred in concluding that the BRA's determination that the project "conforms to the general plan for the city as a whole," as required by § 3-1A of the Boston Zoning Code, was warranted. It is undisputed that the most recent "master plan" for the city was a plan for 1965-1975.[4] The plaintiffs contend that that plan had expired before the 1985 BRA finding and that therefore there could not have been a basis for the finding that the project conformed to "the general plan for the city as a whole." They contend that there cannot be a valid PDA unless and until Boston adopts a new master plan. We agree with the judge that § 3-1A does not establish, as a precondition for a PDA, the existence of a formal, articulated plan for the city. In *Moskow* v. *Boston Redevelopment Auth.*, 349 Mass. 553 (1965), cert. denied, 382 U.S. 983 (1966), this court considered an argument similar to the plaintiffs'. That case involved, in part, an attack on the BRA's approval of an urban renewal plan under (then) G. L. c. 121, on the ground that the plan "did not conform to a general plan for the municipality as a whole." We rejected that argument on grounds equally appli-

---

[4] The Boston zoning commission approved this "General Plan, 1965-1975," after a two-year study by a citizens' advisory committee.

cable here: "[T]here is no provision in [§ 3-1A or elsewhere in the Boston Zoning Code] as to how a general plan is to be formulated, by whom, upon what notice, upon what if any hearing, what it shall contain, and many other details. The plaintiffs contend that the failure of the [PDA] to conform to a nonexistent general plan is jurisdictional. We do not agree. We construe that provision as requiring conformity only where there is such a general plan." *Id.* at 568. The plaintiffs' effort to distinguish *Moskow*, on the basis of minor differences in statutory language, is not persuasive. In our view, in the absence of a formal master plan, the § 3-1A requirement of conformity with the "general plan for the city as a whole" is met by conformity with an informal plan evidenced by precedents of development and extant zoning ordinances and concepts. The plaintiffs do not argue that the BRA record lacks sufficient evidence to warrant a finding that the PDA in question conformed to the city's general plan as understood in that sense.

The plaintiffs make several specific arguments in support of their general contention that the judge erred in concluding that the BRA was warranted in determining that "nothing in [the project] will be injurious to the neighborhood or otherwise detrimental to the public welfare." We confront those contentions that relate to the validity of the BRA's findings. We need not discuss the assertions that the judge incorrectly defined the word "neighborhood," or that she erroneously ruled that "architectural contexuality" was of no consequence to a PDA decision,[5] or that she erred when she ruled that, in assessing

---

[5] The plaintiffs' argument mischaracterizes the judge's discussion of esthetic issues. It seems to us that the judge simply concluded that whatever esthetic harm might be generated by the project would not suffice, either alone or together with other harms associated with the project, to justify overriding the BRA's determination that the project was not injurious to the neighborhood or otherwise detrimental to the public welfare. She stated this clearly: "[T]he draftsmen of the PDA provisions could not have intended that a building whose design might not appeal to every citizen of the City would be deemed injurious to the neighborhood. So far as public welfare is concerned the [positive aspects of the project] set forth above justify the policy decisions that nothing in the Developer's development plan is injurious to the neighborhood or otherwise detrimental to the public welfare, and I so find and rule."

harm attributable to the project, the only harm to be considered is the difference between the amount of anticipated harm flowing from the project and the amount of anticipated harm that would result in any event if a building were built in conformity with the zoning code. The plaintiffs contend that the harm must be measured by comparing the project with the site as an unimproved lot. We do not address these contentions because, even if the judge were in error in these regards, which we do not intimate, it would not follow that the BRA's findings were infected by the same misunderstandings. The plaintiffs have made no effort to demonstrate on appeal that the BRA applied an overly narrow definition of the word "neighborhood" in arriving at its conclusions, or that it failed to consider seriously whether the architecture of the project was compatible with that of the neighborhood, or that it used the wrong point of reference in assessing "injury." Nor does the record show that the plaintiffs urged the judge to remand the case to the BRA for a statement as to the standards it applied. Furthermore, the plaintiffs have not requested that we remand the case to the BRA for such a purpose, and, at this late date, we would be firmly disinclined to do so.

One of the plaintiffs' contentions requiring discussion is the claim that, for approval of a PDA, the code must be literally read to require the BRA to find that "*nothing* in said plan will be injurious to the neighborhood" (emphasis added), that is, that any injury whatsoever, regardless of offsetting benefits, bars a PDA. Of course, it is clear that the BRA could not have found "nothing . . . injurious" in that sense. Contrary to the plaintiffs' contention, the judge ruled that the nothing injurious standard contained in § 3-1A calls for a balancing of the benefits and detriments of a proposed PDA to the neighborhood. We agree with the judge.

Nothing in the language of § 3-1A manifests an intent to derogate from the customary authority of zoning officials, when conferring special treatment, to exercise judgment in determining whether the public welfare will be served thereby. See, e.g., *Zaltman* v. *Board of Appeals of Stoneham*, 357 Mass. 482, 484-485 (1970). Also, the judge's interpretation of the

zoning ordinance is entirely consistent with the legislative history of the PDA provisions. That history demonstrates that the PDA process was intended to establish a more flexible zoning law and encourage large scale private development throughout Boston while insuring good design by improving planning and design controls. This purpose would be defeated by the plaintiffs' proposed construction of § 3-1A, which effectively would bar approval of PDAs.

Moreover, the record demonstrates that several PDAs approved by the BRA in the past have raised significant concerns about traffic, wind, shadow, pollution and parking. In those cases, the BRA did not find that such problems prohibited PDA designation. We give substantial deference to the construction placed on a statute or an ordinance by the agency charged with its administration. See, e.g., *Amherst-Pelham Regional School Comm.* v. *Department of Educ.*, 376 Mass. 480, 491-492 (1978).

Other principles of statutory construction support the judge's ruling. A statute or ordinance should not be construed in a way that produces absurd or unreasonable results when a sensible construction is readily available, see, e.g., *Green* v. *Board of Appeal of Norwood*, 358 Mass. 253, 258 (1970); nor should an enactment be construed in such a way as to make a nullity of pertinent provisions, see, e.g., *Insurance Rating Bd.* v. *Commissioner of Ins.*, 356 Mass. 184, 189 (1969). The plaintiffs' proposed interpretation offends both these precepts. If no PDA could be approved if it resulted in *any* adverse effect on the surrounding neighborhood, no matter how inconsequential the detriment when weighed against the benefits distributed by the project, it is unlikely that any PDA could be approved. The PDA process was designed to encourage and improve large scale development in Boston. It is probable that all large developments, like the 500 Boylston Street Project, raise concerns about wind, traffic, mass transit, and parking.

We conclude that the trial judge properly identified the drafters' intent when she construed § 3-1A in a way which places on the BRA the responsibility to weigh adverse effects of development projects against their benefits, and then determine

whether, on balance, the proposed PDA project will be injurious to the neighborhood or detrimental to the public welfare. The plaintiffs have not argued that the BRA failed to fulfil that responsibility.

We briefly address the plaintiffs' final contention concerning the validity of the BRA's findings, which is that the judge erred by not requiring the BRA to prescribe mechanisms by which some of the anticipated harmful effects of the Project, such as "traffic stalemates and [rapid] transit breakdowns," might be alleviated. The plaintiffs cite no cases or other authorities in support of this proposition. There does not appear to be any legal basis for their contention, and we reject it.

The plaintiffs raise a further issue which, unlike the others, is unrelated to the validity of the BRA findings. The plaintiffs assert that the judge erred in "ruling" that "the evolution of the Project is an on-going process and may be modified with BRA approval." No modification is involved in this case, which concerns, in the words of the judge, "the approval of the Project as originally granted and as attacked by the plaintiffs." Therefore we need not, and are unwilling to, decide in the abstract the appropriate procedural mechanisms for approval in the future of modifications to this or other PDAs.

The plaintiffs have failed to demonstrate that, if the judge erred, the error prejudiced them. Reversal, therefore, is inappropriate. *Deerskin Trading Post, Inc.* v. *Spencer Press, Inc.,* 398 Mass. 118, 121-122 (1986), and cases cited.

*Judgment affirmed.*