Botsford, J.
The plaintiffs, Thomas P. Curran, Jr., (Mr. Curran) and J. Elizabeth Curran (Mrs. Curran) (referred to collectively as the Currans), bring this action to recover damages related to the contamination of the well water supply for their home in Charlton, Massachusetts. Plaintiffs allege that a release of oil or hazardous substances from the defendants’ property emanated to their property, causing the contamination of their well water supply. They bring claims of strict liability under G.L.c. 21E, §5(a)(iii), as well as claims of negligence, private nuisance and trespass. Additionally, plaintiffs seek attorney’s fees and expert witness fees as provided in G.L.c. 21E, §15. Defendants now move for partial summary judgment on the plaintiffs’ claims for emotional distress, future physical injuries, strict liability and attorneys fees. Defendant Mobil Oil Corporation (Mobil) joins with the other defendants in the partial summary judgment motion, and also files a supplemental motion for summary judgment on all remaining claims. For the reasons discussed below, defendants’ joint motion for partial summary judgment is DENIED in part, and ALLOWED, in part; Defendant Mobil’s supplemental motion for summary judgment is DENIED.
BACKGROUND
The following facts are taken from the parties’ submissions. They are essentially undisputed. With respect to disputed facts, either the plaintiffs’ version has been included here or the dispute is noted.
A. The Currans’ Well Water
Early in 1988, the Currans purchased more than an acre of land in Charlton, Massachusetts, located nearly half a mile from the 6W Service Station on the Massachusetts Turnpike. Shortly thereafter, they hired a builder to construct a home on the land. Because the Town of Charlton does not offer water to its residents, the Currans had a well drilled on their property to meet their water needs. The water from this well was tested and deemed potable before the Currans moved into the house. In September 1988, Mrs. Curran, Mr. Curran, and their daughter moved into the house.
During the winter of 1988 or spring of 1989, the Currans detected an unusual kerosene or petroleum- *261 like smell emanating from the various water sources of their home. Despite looking around for possible causes, the Currans could not ascertain the reasons for the odors. For various reasons, the Currans began drinking bottled water but still used their well water for cooking, brushing their teeth, and other household purposes. The Currans’ second child was born in 1989.
In a letter dated August 24, 1990, the defendant Massachusetts Turnpike Authority (MTA), which has owned the 6W service station property at all relevant times, requested the Currans’ permission to allow the MTA’s consultant, Rizzo Associates, to collect and test water samples from their well. In October 1990, the Currans were notified that methyl-tert-butyl ether (MBTE) was detected in their well water. Several weeks later, the MTA notified the Currans that Rizzo Associates wanted to retest their well water. The MTA offered bottled water to the Currans during the interim. After the second test, the Currans were told, in December 1990, that benzene was present in their well water supply in amounts exceeding the maximum acceptable level determined by the Massachusetts Department of Environmental Protection (DEP). A letter of January 28, 1991, informed them that the MTA would install a permanent water treatment system in their home. In April 1991, the MTA informed the Currans that a test conducted of the water in March revealed there were still unacceptable levels of benzene in their well water supply.
In March 1991, the MTA paid for the installation of a water treatment and aeration system. From that time to the present, the Currans’ water supply is tested quarterly. Since the installation of the water treatment system in March of 1991, quarterly tests have indicated that levels of benzene and other contaminants do not exceed acceptable levels.
Thomas P. Army, Ph.D., an environmental engineer retained by the plaintiffs, states in an affidavit that based on his review of various depositions, reports and documents which were produced in discovery of this case, he has formed the opinion that the presence of petroleum contaminants, benzene and MBTE in the Currans’ well water supply “was more probably than not caused by the migration of those contaminants from the 6W service station.” (Army Affidavit, ¶10.)[3]
The MTA was responsible for the maintenance of the water treatment system. Shortly after its installation, the system leaked, causing inconvenience to the Currans. On many occasions, the system lacked water pressure and the Currans were required to fix the machine themselves. Because the system was noisy, the MTA paid for a closet to surround it and reduce the noise level. Despite the water treatment system, the Currans do not drink the tap water or use it for cooking. Mrs. Curran learned from her family doctor that benzene is a carcinogen. Since then, the Currans have only used the well water for bathing. They use bottled water for all other purposes, which they generally transport from relatives’ homes in Norwood. Mrs. Curran stopped growing a vegetable garden because the water aeration system did not treat the outside sprinkler. Because of the water treatment system, the Currans pay an increase of twenty to thirty dollars per month in electricity costs.
Before their water problems, the Currans had decided to sell their house and move closer to their relatives in the eastern part of the state. In July 1990, they listed their house for sale but received no offers. Because of the holidays they took their house off the market in December 1990. After the water problem, the Currans again listed their home for sale and received some interested buyers. The Currans disclosed the past detection of benzene in their well water to the prospective purchasers. The Currans have not sold their house to date.
Although Mrs. Curran admitted she has had severe headaches and nausea before the well contamination, she claims that she has suffered emotional distress regarding this incident and at least once a month continues to suffer headaches accompanied by nausea, insomnia and anxiety. Mr. Curran, a diabetic, had high blood pressure prior to the water problem, and claims that he is suffering emotional distress manifested by headaches and high blood pressure. Both claim their emotional distress is a result of the disruption of their home, their inability to sell their house, and the fear of future injury to themselves and their children due to benzene ingestion. The results from regular visits to doctors indicate that the children suffer no physical ailment or disease as a result of the water contamination. The Currans have received no medical tests indicating that they are at a greater risk of cancer or disease because of the benzene exposure. However, the Currans have submitted an affidavit of Earl M. Wedrow, M.D., a psychiatrist, who states that the Currans’ current symptoms are consistent with post-traumatic stress disorder and emotional distress.[4]
B. The Operation of the 6W Service Station
The MTA has owned the 6W service station in Charlton, Massachusetts since 1957. Beginning in 1957 and continuing through 1982, Exxon leased the station from the MTA. From 1982 to May 16, 1990, F.L. Roberts leased the 6W Service Station. Richard Ford, a manager for F.L. Roberts has admitted that there was a release of 8000 gallons of gasoline from a pipe connected to one of F.L. Roberts’ underground storage tanks in 1983. Later, the DEP began an investigation of the site because oil was detected in the catch basin of the 6W service station.
From May 17, 1990 to the present, Mobil has leased the 6W service station from the MTA. In April 1990, Mobil pressure-tested the existing underground storage system and determined that it was tight. In October 1990, Mobil had the existing underground storage *262 system removed and replaced with a double-walled, fiberglass system. In December 1990, April 1991 and October 1991, Mobil pressure-tested the new system and determined that it was tight.[5]
On October 9, 1992, eighteen gallons of diesel fuel were spilled onto the concrete surface of the 6W service station. In addition, the record indicates evidence of other releases of gasoline product and contaminants from the underground storage tanks after May 17, 1990. Thomas Army, the Currans’ expert witness gives an opinion that the reports on soil conditions after May 1990 are consistent with such releases having occurred. (Army Affidavit, ¶¶5, 6.)
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact in dispute and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further,] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). “Acomplete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial” and mandates summary judgment in favor of the moving party. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991) (citing Celotex v. Catrett, 477 U.S. 317, 322 (1986)).
I. Defendants’ Joint Motion for Partial Summary Judgment
A. Count II. Strict Liability
In Count II of their complaint, the Currans assert a claim for strict liability against the defendants. “One who carries on an abnormally dangerous activity is subject to liability for harm . . . resulting from the activity, although he has exercised the utmost care to prevent such harm.” Clark-Aiken Co. v. Cromwell-Wright Co., Inc., 367 Mass. 70, 89 (1975), quoting Restatement (Second) of Torts §519 (Tent. Draft No. 12, 1964). In ascertaining whether a particular conduct is abnormally dangerous, courts consider the following factors: “(a) whether the activity involves a high degree of risk of harm to the person, land or chattels of others; (b) whether the gravity of the harm which may result from it is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community.” Id., quoting Restatement (Second) ofTorts §520, Comment f (Tent. Draft No. 12, 1964).
In their joint motion for partial summary judgment, defendants conclude that because their conduct in maintaining underground storage tanks on the property of a gasoline station is commonplace, strict liability is inappropriate as a matter of law. In support of this proposition, the defendants rely on Garweth v. Boston Edison, Civil Action No. 90-4437 (Suffolk Super. Ct., Memorandum of Decision and Order on Cross Motions for Summary Judgment, Sept. 12, 1991). In Garweth, the plaintiff sued Boston Edison, a regulated public utility, for a harm based solely on the economic loss doctrine. The Garweth decision does not control here, given the difference in the factual circumstances of the parties and the location of the defendants’ underground tanks. See Clark-Aiken Co. v. Cromell-Wright Co., Inc., supra, 367 Mass. at 89 (whether an activity is abnormally dangerous is to be considered “in light of the surrounding circumstances on the facts of each case”). See also Wellesley Hills v. Mobil Oil Corp., 747 F.Supp. 93, 101 (D.Mass. 1990) (“Mobil’s operation of gas station qualifies as an abnormally dangerous activity, . . . the risk of release of oil is precisely what makes operation of a gas station abnormally dangerous, and . . . such contamination of property constitutes harm to property”).[6]
The factual record presented here, including that the 6W service station is located within one-half mile of a residential community of 80 homes which must rely on wells for water, that the wells are located down-gradient from the service station; and that there are five underground tanks with a storage capacity of 50,000 gallons, indicates that summary judgment in the defendants’ favor on the strict liability issue would be inappropriate. It is for the factfinder to determine whether the underground storage of large quantities of gasoline at the 6W service station site is abnormally dangerous. Therefore, defendants’ motion for summary judgment as to this count is DENIED.
B. Emotional Distress Damages
In paragraph 23 of their complaint, the Currans allege that they suffer emotional distress from their increased susceptibility of disease as a result of the defendants’ conduct.[7]
“[A] plaintiffs physical harm must either cause or be caused by the emotional distress alleged.” Payton v. Abbott Labs, 386 Mass. 540, 556 (1982). To recover for negligently inflicted emotional distress, a plaintiff must prove: “(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case.” Id. at 557. “In order to satisfy Payton, plaintiffs must provide an objective corroboration of the emotional distress claimed.” Sullivan v. Boston Gas Co., 414 Mass. 129, 137 (1993) (quotation omitted). In some cases, expert medical testimony may be necessary to corroborate the claim. Id. “Medical experts, however, need no£ have observed an actual external sign of physical deterioration.” Sullivan, supra, 414 Mass. at 138, citing Anderson v. W.R. Grace & Co., 628 F.Supp. 1219, 1227 (D.Mass. *263 1986). In determining whether a plaintiff has established facts which support a claim for emotional distress, “the judge will use his or her discretion to evaluate the evidence keeping in mind that the overall goal is to determine whether the evidence sufficiently corroborates the plaintiffs claims of mental distress and to strike a balance between the fear of fraudulent claims and the danger that worthy claims will not be heard.” Id. Headaches may be deemed physical manifestations of emotional distress. Id. at 139. The type of conduct evoking the emotional distress may sometimes corroborate the “genuineness of the claim.” Id. at 140.
Mrs. Curran claims as a result of the entire water incident and the defendants’ negligence, she has suffered emotional distress manifested by insomnia, headaches and nausea. Unlike the typical claim for emotional distress in which the plaintiff first receives a physical injury, and as a result suffers emotional distress, Mrs. Curran contends that her headaches, insomnia and nausea are caused by her emotional distress. Both situations are compensable tort theories of emotional distress. Payton, supra, 386 Mass. at 556. These symptoms, she claims, have continuously plagued her at least once a month since she learned of the presence of benzene in her water supply. Her symptoms are supported by the affidavit of Dr. Wedrow, who surmised that the physical symptoms of which Mrs. Curran complains are consistent with post-traumatic stress disorder. Dr. Wedrow, in his affidavit, further noted subtle, mental manifestations of her emotional distress such as her compulsion with the contamination incident. Her physical manifestations of emotional distress, as well as the corroboration of Dr. Wedrow, provide “objective symptomatology” of Mrs. Curran’s emotional distress. Likewise, Mr. Curran claims he suffers emotional distress as a result of the entire incident arid as a result of their present inability to sell their home. After examining Mr. Curran, Dr. Wedrow opined that he too suffers from post-traumatic stress disorder manifested by headaches and insomnia.
In light of the evidence presented by the Currans themselves and by Dr. Wedrow, I conclude that the defendants are not entitled to summary judgment on the Currans’ emotional distress claims in their entirely. However, in depositions, Mr. and Mrs. Curran each recounted that their emotional distress is due in part to their concern for the future health of themselves and their children. Massachusetts does not allow recovery for emotional distress damages for fear of future injury. Payton, supra, 386 Mass. at 544.[8] Accord, Anderson v. W.R. Grace & Co., 628 F.Supp. at 1228. See Ball v. Joy Technologies Inc., 948 F.2d 36 (4th Cir. 1991) (plaintiffs exposed to toxic chemicals could not recover for fear of future injury); Plummer v. Abbott Laboratories, 568 F.Supp. 920 (D. R.I. 1983) (no recovery for future medical surveillance where plaintiff suffered no present physical injury). Only where a plaintiff alleges emotional distress for an increased risk that a disease will occur from the same disease process from which she or he currently suffers can there be recovery of damages for future injury. Anderson, supra, 628 F.Supp. at 1231. In other words, where a plaintiff claims a present physical injury which increases his susceptibility, he may recover for mental anguish and fear of developing cancer in the future. Clark v. Taylor, 710 F.2d 4, 14 (1st Cir. 1983).
The Currans, as indicated above, neither claim to suffer emotional distress caused by a physical injury or disease nor allege a present physical harm which predisposes them, or increases their susceptibiliiy, to cancer. To allow recovery of emotional distress damages for the mere possibility that plaintiffs may develop a disease would be precipitous. Awarding damages “on a mere mathematical probability would significantly undercompensate those who actually do develop cancer and would be a windfall to those who do not.” Anderson, supra at 1232, quoting Arnett v. Dow Chemical Corp., Civil No. 729586 (Cal. Sup. Ct. March 21, 1983). The Currans may not recover emotional distress damages for an increased risk of disease or for their concern that they or their children may suffer future injury. Rather, any recovery for emotional distress damages is limited to the emotional distress manifested by headaches, insomnia and nausea which they claim to suffer because of the water contamination and resulting disruption of their home and inability to sell their house.
C. Claim for Attorney and Expert Witness Fees
In this action, plaintiffs seek an award of attorney and expert witness fees pursuant to G.L.c. 21E, §15. Section 15 provides: “In any suit by Massachusetts residents to enforce the requirements of this chapter, or to abate a hazard related to oil or hazardous materials in the environment, the court may award costs, including reasonable attorney and expert witness fees, to any party other than the commonwealth who advances the purposes of this chapter” (emphasis supplied). Section 4A of G.L.c. 21E provides that in an action filed “pursuant to section four or this section, the court shall award the plaintiff its litigation costs and reasonable attorney’s fees if the plaintiff shows, and the court finds, that the person against whom the civil action is brought is liable.”[9] (Emphasis supplied.)
As the Currans point out, “[sjtatutory language itself is the principal source of insight into the legislative purpose.” Guaranty-First Trust Co. v. Textron, 416 Mass. 332, 335 (1993). By express statutory language, G.L.c. 21E, §15 bestows on the court, in cases in which a party advances the statute’s purpose, the discretion to award attorney and expert witness fees. Conversely, c. 21E, §4A provides that, if certain conditions are met, the court shall award the plaintiff attorneys fees and costs.
*264 A principal purpose of G.L.c. 21E is to allow both the Commonwealth and private individuals “to respond to environmental contamination and to recover response costs from persons responsible for the contamination.” Guaranty-First Trust Co. v. Textron, supra, 416 Mass. at 335. Nevertheless, another statutory purpose is “to enable private individuals to obtain a certain measure of compensation for loss resulting from environmental damage.” Id.
Presented with a private cause of action for reimbursement of response costs pursuant to G.L.c. 21E, §4, at a time before c. 21E, §4A was in effect, the Supreme Judicial Court determined that §15 allowed the court to award the plaintiff attorney and expert witness fees. Sanitoy, Inc. v. Ilco Unicon Corp., 413 Mass. 627, 631-33 (1992). Massachusetts appellate courts have yet to address the issue of whether §15 provides for an award of attorney and expert witness fees to a party bringing suit under c. 21E, §5(a)(iii) for damage to real or personal property.
The defendants argue that §15 is not intended to allow recovery of attorney and expert witness fees to private parties seeking to recover only property damages. They claim that Sanitoy is inapposite since it involved a claim for such fees in a suit in which the plaintiffs did seek to recover response costs. I do not agree. General Laws c. 21E, §4A now expressly provides for the recovery of attorney and expert fees related to response cost recovery actions. When the legislature enacted §4A, however, it also left §15 on the books. If §15 is to have any meaning, it must be read at least to permit the award of attorney and expert fees even where property damages alone are sought. See, e.g., Mathewson v. Contributory Retirement Appeal Board, 335 Mass. 610, 614-15 (1957). See also Manning v. Boston Redevelopment Auth’y, 400 Mass. 444, 453 (1987).
Accordingly, I conclude that the defendants are not entitled to summary judgment on the Currans’ claim for attorney and expert witness fees.[10] It will be up to the trial judge to determine whether fees requested by the Currans should be awarded.
II. Mobil’s Supplemental Motion for Summary Judgment
When “the defendant has demonstrated that the plaintiff has no reasonable expectation of proving an essential element of his case” summary judgment should enter in defendant’s favor. O’Connor v. Smith Kline Bio-Science Laboratories, 36 Mass.App.Ct. 360, 363 (1994), citing Kourouvacilis v. General Motors Corp., supra.
A jury is qualified to determine questions of causation. O’Connor, supra, 36 Mass.App.Ct. at 363. “If the evidence, viewed in the light most favorable to the plaintiff, established no more than a possibility of such a causal relationship, any resulting jury verdict would be based on speculation and could not stand.” Id. See Providence & Worcester R. Co. v. Chevron U.S.A., Inc., 416 Mass. 319, 321-23 (1993) (directed verdict for defendant proper where, among other factors, there was no expert opinion that the only oil spill at issue, more probably than not, was a cause of the complained-of site contamination).
Mobil contends that the court should enter summary judgment in its favor on all the Currans’ claims against it. Principally, Mobil maintains that the Cur-rans cannot establish a link between Mobil’s conduct and their injury. The argument fails. Dr. Army’s affidavit presents opinion evidence that brings the plaintiff beyond the realm of speculation. The affidavit, considered with the documents attached to it, present material issues of disputed fact concerning both the cause of the contamination of the Currans’ well water supply and the role of Mobil in that contamination. Defendant Mobil’s supplemental motion for summary judgment must therefore be denied.
ORDER
For the foregoing reasons, it is ORDERED that the defendants’ joint motion for partial summary judgment be ALLOWED with respect to the claim for emotional distress damages based on fear of future injury or disease; and be otherwise DENIED; and that Mobil Oil Corporation’s supplemental motion for summary judgment be DENIED.

 Mobil has moved to strike the affidavit of Dr. Army. For reasons stated in the margin of the motion itself, that motion is denied.

 The defendants have moved to strike the affidavit of Dr. Wedrow on timeliness grounds. For reasons stated on the face of the motion, that motion is denied.

 The Currans, through their expert, Thomas Army, dispute the accuracy of the pressure tests.

 In Wellesley Hills, strict liability was not imposed because the plaintiff failed to show “harm to the person or property of another.” Wellesley Hills v. Mobil Oil Corp., 797 F.Supp. 93, 102 (D.Mass. 1990). Rather the plaintiff [in Wellesley] claimed that the defendant Mobil, a previous owner of the plaintiffs property, caused harm to its own property.

 Although the Currans have not filed a separate claim for emotional distress, they seek damages for the emotional distress which they allegedly suffer.

 Cancerphobia, a type of emotional distress, is compen-sable in other jurisdictions. Hagerty v. L.L. Marine Services, Inc., 788 F.2d 315 (5th Cir. 1986); Sterling v. Velsicol Chemical Corp., 647 F.Supp. 303 (W.D. Tenn. 1986).

 Section 4 of G.L.c. 2 IE provides a cause of action for recovery of site assessment and clean-up costs (responsive costs).

 In so stating, however, I do not imply any judgment whatsoever that the award of such fees would be appropriate in this case. In this regard, it bears noting that the Currans have not undertaken any remedial response actions. Rather, the MTA, on its own initiative and pursuant to DEP directives, undertook to test the Currans’ well water and to install and maintain a water treatment system.