Alfred J. RASO, et al., Plaintiffs,

v.

Marisa LAGO, et al., Defendants.

Civil Action No. 96–11945.

United States District Court,
D. Massachusetts.

Jan. 6, 1997.

Chester Dowling, Boston, MA, Donald P. Zerendow, Cohasset, MA, for plaintiffs.

Saul Schapiro, Boston, MA, for Marisa Lago, Boston Redevelopment Authority.

Susan M. Poswistilo, U.S. Atty's Office, Boston, MA, for Henry G. Cisneros, Dept. of Housing & Urban Development.

Kevin S. McDermott, Boston, MA, for Thomas Menino, City of Boston, Victoria L. Williams, Boston Fair Housing Com'n, Boston Housing Authority, Rudolph F. Pierce, Lynne Alix Morrison, David W. Fanikos, Boston, MA, Michael L. Altman, Boston, MA, Richard Bluestein, Paul Holtzman, Boston, MA, for Robert H. Kuehn, Jr., Keen Dev. Corp., Michael F. Groden, Planning Office for Urban Affairs, Inc., Lowell Square Associates, Lowell Square Coop. Ltd. Partnership, Mark Maloney, Maloney Properties.

### MEMORANDUM AND ORDER

WOLF, District Judge.

## I. INTRODUCTION

Plaintiffs, a putative class headed by several former residents of Boston's Old West End neighborhood and the Old West End Housing Corporation ("OWEHC"), an organization devoted to the resettlement of for-mer West End residents, seek among other things a declaration that they are entitled to preference for all of the new dwelling units soon to become available in the buildings now being constructed at West End Place. Plaintiffs have named as defendants numerous parties who, for purposes of identification and representation, can be categorized into four groups: (1) the Boston Redevelopment Authority and its Director, Marisa Lago, (collectively the "BRA"); (2) the United States Department of Housing and Urban Development ("HUD") and its Secretary, Henry Cisneros, (collectively the "Federal Defendants"); (3) the City of Boston and its Mayor, Thomas Menino, the Boston Fair Housing Commission and its Director, Victoria Williams, and the Boston Housing Authority, and its Director, Sandra Henriquez,[1] (collectively the "City Defendants"); and (4) Keen Development Corporation and its President, Robert Keuhn, Jr., who is also a Trustee of the Lowell Square Nominee Trust, the Planning Office of Urban Affairs, Inc. and its Director, Reverend Michael Groden, also a Trustee of the Lowell Square Nominee Trust, Lowell Square Associates, Joint Venture, Lowell Square Cooperative L.P., and Maloney Properties, Inc., and its President Mark Maloney (collectively the "Developer Defendants").

The court first encountered this case on October 21, 1996 in the form of an emergency motion for a preliminary injunction, which plaintiffs filed in an effort to halt the preliminary housing lottery for units at West End Place scheduled for October 29, 1996. In a hearing held on October 28, 1996, plaintiffs withdrew their effort to enjoin the lottery because the Developer Defendants were willing to permit members of their putative class to be present and monitor the lottery process. See October 28, 1996 Transcript at 3.

The Developer Defendants, however, informed the court that the mere pendency of this case constitutes an event of default under the terms of their loan agreements and its perpetuation could imperil the project's financing. Therefore, the court established a

---

1. Plaintiffs have voluntarily dismissed the Boston Housing Authority. *See* November 20, 1996 Transcript, at 4.

schedule for the expeditious resolution of defendants' then planned motion to dismiss. After an opportunity for discovery related to issues the defendants informed the plaintiffs they would raise in their motion to dismiss, on November 20, 1996 the court heard argument on that motion which, to the limited extent it relies on information outside the Complaint (which incorporates a number of exhibits), is being treated as a motion for summary judgment. *See* Fed. R. Civ. P. 12(b)(6).

As explained below, the court finds that plaintiffs may lack standing to litigate whether the BRA's actions required the approval of the Boston City Council and, in any event, this claim is time-barred. The court has considered the merits of every other claim in the complaint and finds that plaintiffs have no statutory or contractual property right to an absolute preference to the units at West End Place. The absence of a state-created property interest eliminates plaintiffs' claim, under 42 U.S.C. § 1983, that they had a right to due process that has been violated.

Plaintiffs also appear to allege in Count III that the defendants' plan to affirmatively solicit minority applicants for West End Place discriminates against them because they are predominantly white, in violation of their Fourteenth Amendment right to equal protection under the law. To the extent that plaintiffs attack defendants' affirmative marketing plan facially, their claim is deficient because it fails to allege that the defendants acted with discriminatory intent, and because the affirmative recruitment of minority applicants is not itself a "benefit" subject to equal protection analysis; the plan for actual tenant selection does not provide for consideration of race or give minorities any preference. Plaintiffs' claim under Title VI of the Civil Rights Act of 1964 is similarly deficient. Finally, plaintiffs' allegation that the plan violates Title VIII of the Civil Rights Act of 1968 is being dismissed for failing to allege specific facts that would permit a finding that some practice disproportionately burdens a protected class.

To the extent, however, that the equal protection, Title VI, and Title VIII claims are meant to challenge an illegal divergence from the terms of the affirmative marketing plan during its operation, they appear to be premature. However, the court will provide the parties an opportunity to address whether plaintiffs should be afforded an opportunity to move to amend their complaint, or whether these claims should now be dismissed without prejudice.

## II.  FACTS

Except as otherwise noted, the facts of this case are taken from the Complaint and the exhibits it incorporates. In approximately 1959, as part of an urban renewal project, the City of Boston took title by eminent domain to a large swath of land in Boston known as the West End. Approximately three thousand households were displaced by this government action. Compl., ¶ 35. These residents were a largely immigrant community composed of a mix of different ethnic groups, including Irish, Italians, Jews, Greeks, Poles, Albanians, Ukrainians, Russians, Native Americans and African–Americans. *Id.* at ¶ 32. Defendants estimate that the displaced residents were approximately 98% white. Declaration of Merryl Gibbs ("Gibbs Decl."), Federal Def.'s Opposition to Pl.'s Motion for Preliminary Injunctions and Orders ("Fed. Def.'s Opp. to P/I"), Exhibit 2, at ¶ 15. The plaintiffs evidently do not dispute the fact that the overwhelming majority of the displaced residents were white.[2] In any event, although numerous redevelopment projects over the years erected new residential structures in the West End, many of the displaced residents of the Old West End were unable to afford the new housing and, therefore, were unable to return to their old neighborhood. *Id.* at ¶ 33.

Under the original West End Plan of 1959, Charles River Park, Inc. ("CRP") was designated the private redeveloper of the Plan Area. In 1990, a state court determined that

---

**2.**  Indeed, plaintiffs attached to their Complaint a preliminary marketing analysis conducted by the Developers in April 1996 which showed that of the former West End residents who were "defi-nitely interested" in living at West End Place, 433 were white, 19 were Black, 4 were Latino, and 12 checked "Other." Preliminary Marketing Analysis, April 10, 1996, Compl., Exhibit H.

CRP had defaulted under the Master Lease Agreement. *Id.* at ¶ 36. Within the next year, the BRA designated Lowell Square Associates ("LSA") as the redeveloper of the last remaining undeveloped parcel of the Old West End the land at the intersection of Causeway Street and Lomasney Way, known as "Lowell Square" or "Area E." *Id.* at ¶ 44. In a grant proposal, LSA stated that "Lowell Square is the last opportunity for the City and State to assist former West Enders and other low and moderate income households to reclaim a corner of this community." *Id.* at ¶ 50.

At about the same time that LSA was designated the redeveloper of Area E, United States District Judge Walter J. Skinner presided over the conclusion of a decade-long legal battle between the Boston Chapter of the National Association for the Advancement of Colored People ("NAACP") and HUD concerning the availability of public housing to minorities in Boston. In that litigation, Judge Skinner found that:

> HUD had failed to satisfy the minimum levels of compliance required by [42 U.S.C.] § 3608(e)(5) in two respects. First, the agency did not require the City to establish an effective fair housing enforcement program in the face of its knowledge of pervasive racial discrimination in the City. Second, despite its knowledge that a housing emergency existed which had a disproportionate impact on low income black families, HUD did not condition its provision of federal funds ... on construction of affordable integrated public housing.

*NAACP, Boston Chapter v. Kemp,* 721 F.Supp. 361, 365 (D.Mass.1989);[3] *see also NAACP, Boston Chapter v. Pierce,* 624 F.Supp. 1083, 1085 (D.Mass.1985), *vacated on other grounds,* 817 F.2d 149 (1st Cir.1987). In light of those findings, on March 8, 1991 Judge Skinner entered a Consent Decree

obligating HUD, among other things, to require any recipient of federal housing funds to implement an affirmative fair housing marketing plan in order to enhance low-income African–American households' access to affordable housing in the Boston area. *NAACP, Boston Chapter v. Kemp,* No. 78–850–S, slip op. (D.Mass. March 8, 1991), attached at Compl., Exhibit C ("Consent Decree"), at 2. The Consent Decree established as a goal that affirmative marketing programs achieve a racial composition in federally assisted housing which "reflects the racial composition of the City [of Boston] as a whole." *Id.* It also expressly stated, however, that: "Nothing herein shall constitute or be construed as requiring a quota." *Id.*

The Lowell Square project is, in part, federally funded through several programs administered by HUD.[4] Among the criteria established by HUD to select recipients for such funding is whether the project will increase housing choices and foster neighborhood diversity. 60 Fed.Reg. 5806, 5808 (January 30, 1995); *see also* Gibbs Decl., ¶ 8. In addition, as discussed *infra,* even without regard to the Consent Decree, federal law requires affirmative fair housing marketing to minorities in federally funded projects. *See, e.g.,* 24 C.F.R. § 200.610 (1996). Thus, addressing this issue was essential to securing federal funding for West End Place. After much discussion, and a mediation, among those involved in the Lowell Square project about how to accommodate the requirements of federal law and the interests of former West Enders, on May 14, 1994, LSA entered into a Participation Agreement with OWEHC which states in part that "purchase (and/or rental) preference shall be afforded to former West Enders *(subject only to applicable local, state, and federal laws ... ),* both at initial occupancy and through turnover throughout the life of the development." Participation Agreement, Pl.'s Mem. in Sup-

---

3. 42 U.S.C. § 3608(e)(5) requires HUD and its grantees to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter [entitled 'Fair Housing']."

4. Federal funding derives from several sources including the Section 8 Community Investment Demonstration Program, enacted by the HUD

Demonstration Act of 1993, P.L. 103–20, § 6, 107 Stat. 1148, *reprinted in* 42 U.S.C.S. § 1437f, at 50 (Supp. May, 1996), and the HOME Investment Partnership Act of 1990, 42 U.S.C. §§ 12741 *et seq. See* Federal Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion to Dismiss, at 2.

port of Their Motion for Preliminary Injunctions ("Pl.'s P/I Mem."), Exhibit K, at 7 (emphasis added).

On December 21, 1994, the BRA exercised its power of eminent domain to take title to the land in Area E. Compl., at ¶ 61. One week later, the BRA entered into a Land Disposition Agreement ("LDA") with the developers and deeded the property to them. *Id.* at ¶ 63. These documents set the terms and conditions for the Lowell Square project. The LDA contains a provision which states: *"Subject to the Affirmative Fair Housing and Marketing Plan attached hereto* ... the Redeveloper agrees to give preference in the selection of Unit Lessees for dwelling units built on the Property to displaced families ..." LDA, Compl., Exhibit D, at 29 (emphasis added). The adoption of this Affirmative Fair Housing and Marketing Plan ("AFHMP" or the "Plan") was a requirement of federal law. Federal regulations require recipients of HUD assistance to "[c]arry out an affirmative program to attract buyers or tenants ... of all minority and majority groups to the housing for initial sale or rental." 24 C.F.R. § 200.620 (1996); *see also* Fed. Def.'s Opp. to P/I, at 4 & n. 3. The AFHMP was also required by the *Kemp* Consent Decree. Consent Decree, at 6 (citing 24 C.F.R. § 200.620).

The AFHMP designed for West End Place states that its goals are:

> to provide a community at West End Place that will reflect the racial and economic diversity of the City at large while housing as many West Enders displaced by Urban Renewal as possible. The minority participation goal set forth in this plan is 41% which is also representative of the City's overall minority population.

Affirmative Fair Housing and Marketing Plan, West End Place, Boston, Massachusetts, July 19, 1996, Exhibit A to Affidavit of Mark Maloney ("Maloney Aff."), (Developer Defendants') Opposition to Motion for Preliminary Injunction ("Developers' Opp. to P/I"), Exhibit C, at 11. Under the AFHMP, this "goal" is to be pursued primarily through an advertising strategy which targets minorities. *Id.* at 13–14.

At the same time, however, the Plan also provides "special outreach" efforts to former West Enders, including notification "by a letter which requested that they indicate their interest in West End Place by contacting the Old West End Housing Corporation." Maloney Aff., at ¶ 9.[5] The Developer Defendants also conducted additional marketing beyond that specified in the Plan. They sent information to more than 1500 people who had expressed an interest in West End Place, and they advertised to former West Enders through their newspaper, *The West Ender. Id.* at ¶¶ 6–7.

In an attempt to accommodate the interests of former West Enders and to leave ample units available to minorities and other applicants, in the AFHMP the Developers set aside 55% of the residential units for former West Enders. Maloney Aff., at ¶ 4; *see* AFHMP, at 21–22 (draw ratios reflecting set-aside). The residential component of West End Place consists of 183 cooperative apartments. AFHMP, at 1; Affidavit of Robert Keuhn, Jr. ("Keuhn Aff."), Developers' Opp. to P/I, Exhibit A, at ¶ 54. 58 of these are classified as low-income (Section 8–financed) units, 48 are moderate-income units, and 77 will be rented at market rates. AFHMP, at 8; Keuhn Aff., at ¶ 54. Of these the following are reserved for former West Enders: 33% (or 19) of the low-income units; 50% (or 24) of the moderate-income units; and 75% (or 58) of the market-rate units. Maloney Aff., at ¶ 4. In order to reserve a portion of the Section 8–financed units for former West Enders, the Developers sought and obtained special waivers from HUD's Assistant Secretary of Housing. Gibbs Ded., ¶ 16.

According to the AFHNP as written, the actual tenant selection process consists of a series of steps. Throughout the affirmative marketing and outreach efforts, the Developers will accept written applications from pro-

---

**5.** The AFHMP also provides for additional marketing and outreach efforts to two other groups not defined by race: "people living with AIDS," and "physically challenged" people. AFHMP, at 11.

spective tenants. AFHMP, at 18–19.[6] In addition to requesting income information, the application forms provide boxes in which applicants can identify themselves as former West Enders and indicate their race. *See* Pl.'s Mem. in Opposition to Def.'s Motions to Dismiss ("Pl.'s Opposition"), Exhibit A.[7] After the deadline for accepting applications passes, an initial lottery is held which randomly assigns each applicant an overall rank for selection purposes. *Id.* at 21.

These preliminary stages of the tenant selection process have been completed. The developers sent out 3172 preliminary applications and received 1858 back, 308 from former residents of the West End. Supplemental Affidavit of Mark Maloney ("Suppl. Maloney Aff."), at ¶ 11. Of these 308, 152 former West End residents have represented that they qualify for the 58 low-income units, 100 that they qualify for the 48 moderate-income units, and 56 that they can afford the 77 market-rate units. *Id.* The number of applicants displaced from the West End, therefore, exceeds the number of spaces set aside for them within the development and, indeed, for two of the categories exceeds the total number of units. *Id.* at ¶¶ 5–6.

The applications also reveal the racial composition of the putative plaintiff class. Of the 308 applications reviewed from former West Enders, all but 19 applicants identified their race. Maloney Aff., at ¶ 12; Suppl. Maloney Aff., at ¶ 11. 276 applicants were white, 12 were African–American, and one was Latino. Maloney Aff., at ¶ 12. Thus, excluding the 19 who did not identify their race, it appears that the former West Enders interested in renting at West End Place are 95.5% white and 4.17% African–American.

The lottery for numerically ranking the applicants was conducted on October 29, 1996. Second Affidavit of Mark Maloney, Mem. in Support of Developer Def.'s Motion to Dismiss ("Developer's Mem."), Exhibit A, ¶ 2. Plaintiffs Alfred J. Raso and Frank Lavine were among those applicants, and they received lottery numbers 1686 and 1053 respectively. Pl.'s Opposition, Exhibit A.

The next step in the tenant selection process, according to the AFHMP, will be to separate the applicants into two pools: one for former West Enders and one for all other applicants. AFHMP, at 21; *see also* Maloney Aff., at ¶ 13. After they are so divided, the following step will be "to verify the income and other eligibility criteria for the highest ranked applications in the two pools." AFHMP, at 21.[8] Finally, the highest-ranked applicants will be matched to apartments with the appropriate number of bedrooms in their income bracket according to a prescribed drawing ratio reflecting the set asides for West Enders in each income bracket. *Id.* Thus, for low-income units, the draw ratio is one West Ender to every two non-West Enders; for moderate-income apartments the ratio is 1:1; and for market-rate apartments the ratio is 3:1. *Id.*[9] The

---

6. Advertisements for West End Place direct interested people to call Maloney Properties, which then sends out application forms. AFHMP, at 19.

7. The West Ender preference box is titled "ELIGIBILITY FOR PREFERENCE STATUS" and prompts the applicant to answer yes or no to the following statement: "You were living in the West End of Boston and displaced by urban renewal after March 1, 1953. Displacees are defined as heads of household, their spouses, children and/or other person for whom any member of the household had a legal obligation to provide care." If an applicant checks "Yes," he or she must write in the year of the displacement. *Id.*

The race/national origin box, which provides various options for the applicant to check, states: "Race/National Origin information will be used for statistical purposes only, and will not affect the status or selection of applicants. Answering this question is completely optional." *Id.*

8. The other "eligibility criteria" are defined earlier in the Plan to include household size and various risk factors, based on indicia such as past behavior, landlord recommendations, and criminal record, that would suggest, among other things, that the applicant would not pay rent or would endanger other residents. *See* AFHMP, at 16–18.

9. The AFHMP describes the mechanics of this process. For example, in the low-income category the selection would proceed as follows:

The first eligible applicant based on the lottery ranking in Pool A [former West Enders] will be selected followed by the first two applicants in Pool B [non-West Enders]. This process is repeated, one draw versus two draws, until all

matching of applicants to apartments continues until all of the apartments in a category are assigned. *Id.* at 22. The AFHMP also provides for the creation of a waiting list for future vacancies, *id.* at 20, procedures for accepting applicants from that list, *id.* at 23, as well as "continuing affirmative marketing objectives," *id.* at 15. The Developer Defendants have pledged that in "processing applications, selecting residents from among eligible applicants of [sic] the waiting list and assigning units," they will not discriminate based on, among other things, race or color. *Id.* at 12.

As the foregoing indicates, the AFHMP does not provide for the consideration of race in establishing priorities or assigning units. Qualified African–Americans and other minorities may be included in the pool of applicants eligible for the 55% of the units reserved for displaced West Enders. Whites are eligible for the remaining units that are to be made available to applicants without roots in the West End. Within each pool, of applicants, priority for the assignment of units is, under the AFHMP, established by a lottery which does not take race into account. Rather, the Developer Defendants are depending solely on the efficacy of their affirmative recruitment of qualified minority applicants in seeking to achieve their goal of a tenant population that is as diverse as the City of Boston. If this effort fails, however, no. one will be assigned a unit in whole or inpart because of his or her minority status. As Plaintiffs have recognized, at this time it is too early to determine whether the Developer Defendants have deviated from the AFHMP in any way which may be material to the legality of their conduct. *See* November 20, 1996 Transcript ("Tr.") at 66–67. Accordingly, the court is addressing the legality of the AFHMP as written. The legality of the Developer Defendants' actual conduct at all.

## III. SUMMARY OF COMPLAINT

The rather rambling complaint consists of six counts, several of which allege multiple

causes of action. Count I seeks a declaratory judgment that a property right in the form of an equitable easement and servitude vested in the plaintiffs the moment the BRA took title to Area E and that members of the putative plaintiff class are entitled to exercise their statutorily conferred preference as a right of first refusal in West End Place. Compl., at 22. Count II seeks a declaratory judgment that the legislature created a trust for the plaintiffs in M.G.L. c. 121B, § 49, thus making the BRA and all of its successors in interest trustees who owe a fiduciary duty to members of the putative plaintiff class who are alleged to be the beneficiaries of the trust. *Id.* at 22–23. It also requests various forms of injunctive relief for alleged breaches of fiduciary duty, including the requirement.that the BRA obtain approval for the project from the Boston City Council and the Massachusetts Department of Community Affairs ("DCA") pursuant to M.G.L. c. 121B, § 48. *Id.* at 23–24. Neither the Boston City Council nor the DCA are parties to this case, but the Council filed an *amicus* brief contending its approval was required. *See generally* Memorandum in the Nature of an Amicus ("Amicus").

Counts III and IV are claims brought under 42 U.S.C. § 1983 for the following acts: (1) failing to enforce plaintiffs' claimed statutory preference according to M.G.L. c. 121B, § 49; (2) unlawfully modifying the content and subject matter of the original West End Plan; (3) permitting the original developer, CRP, to convert all rental units in the Plan Area to condominiums; (4) failing to obtain City Council and DCA approval of the changes to the Plan; and (5) applying the Consent Decree to the tenant selection process and "thereby depriving the Plaintiffs of a benefit on the basis of racial classifications." Compl., at 25–26.

Count V alleges that the application of the terms of the Consent Decree and the AFHMP to the tenant selection process discriminates against plaintiffs on the basis of their race in violation of the Fair Housing

one bedrooms reserved in [the] low-income category are assigned, and the same procedures will be followed to assign the two and three bedroom apartments in this income cate-

gory. If at any time Pool A or Pool B is exhausted of eligible applicants, selection will then be made solely from the remaining pool. *Id.* at 22.

Act, Title VIII of the Civil Rights Act of 1968. *Id.* at 26. Finally, Count VI makes a similar allegation arising under Title VI of the Civil Rights Act of 1964. *Id.* at 27.

## IV. DISCUSSION

### A. *Standard for Deciding Motion to Dismiss*

"In considering a motion to dismiss, a court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993). A court may also "properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996) (citing *Watterson,* 987 F.2d at 3–4)[10] "A complaint should not be dismissed for failure to state a claim unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Miranda v. Ponce Federal Bank,* 948 F.2d 41, 44 (1st Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

The standard for stating a claim upon which relief can be granted is not, however, "toothless." *The Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989). Plaintiffs must "set forth in their complaint 'factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory.'" *Id.* (quoting *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515 (1st Cir. 1988)). As described further, *infra,* in a civil rights case, meeting this obligation is partic-

ularly important. *Id.* In order to "avoid tarring defendants' reputations unfairly and to prevent potential abuses, . . . plaintiffs [must] outline facts sufficient to convey specific instances of unlawful discrimination." *Id.*

If, as in some respects here, on a motion to dismiss for failure to state a claim upon which relief can be granted matters outside the pleadings are considered, the motion is treated as one for summary judgment. Fed. R. Civ. P. 12(b)(6). Summary judgment is appropriate only if the record, viewed in the light most favorable to the non-moving party, "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *National Amusements. Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995). Among other things, on a motion for summary judgment an opposing party is entitled to relevant discovery and an opportunity to present all pertinent material. Fed. R. Civ. P. 56(f) and 12(b)(6). As explained below, to the limited extent matters outside the Complaint have been relied upon, the court is satisfied that plaintiffs have had all the discovery necessary to address the issues that are now ripe for decision.

### B. *Plaintiffs' Claims Are Time–Barred Under M.G.L. 121B, § 48*

The defendants initially challenged plaintiffs' standing to raise their § 1983, Title VI, and Title VIII claims. However, subsequent to named plaintiffs Raso and Lavine's filing of residence applications for West End Place, they retracted that contention. *See* Tr. at 30.[11] Nevertheless, defendants continue to maintain their opposition to plaintiffs' standing to bring a claim based upon M.G.L. c. 121B, § 48.[12]

---

10. The Complaint refers to the AFHMP either directly or by inference in paragraphs 68(b), 101, 105, 107, and 109, but does not include a copy. Defendants placed a copy of the Plan into the record. *See* Fed. Def.'s Opp. to P/I, Exhibit 3; Developer's Opp. to P/I, Exhibit C.

11. Because Raso and Lavine's standing is uncontested on these issues, the court will not address the distinct and more difficult issue of organizational standing presented by OWEHC's status as a plaintiff. *See, e.g,, United Food and Commer-*

*cial Workers Union Local 751 v. Brown Group, Inc.,* —— U.S. ——, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996); *Citizens to End Animal Suffering and Exploitation, Inc. v. New England Aquarium,* 836 F.Supp. 45 (D.Mass.1993).

12. Section 48 states in pertinent part: "No urban renewal project shall be undertaken until (1) a public hearing relating to the urban renewal plan for such project has been held after due notice before the city council . . . and (2) the urban renewal plan therefor has been approved

Plaintiffs assert that a series of BRA decisions related to the Lowell Square project were "ultra vires" because they were made without DCA and City Council approval under § 48 or its predecessor, M.G.L. c. 121, § 26KK. *See, e.g.*, Pl.'s Mem. in Support of Their Motion for Preliminary Injunctions ("Pl.'s P/I Mem."), at 13–15.[13] Defendant BRA responds that § 48 does not require City Council approval of its action in this case, that there is no private right of action under § 48, and in any event plaintiffs' effort to secure judicial review is time-barred. *See* BRA Mem. in Support of Motion to Dismiss ("BRA Mem."), at 3–8. The court agrees that. it is questionable whether § 48 provides a right of action for private parties, like plaintiffs, to challenge BRA decisions. In any case, the court finds that plaintiffs' action under § 48 is time-barred.

■ Section 48 details the approval process a proposed urban renewal plan must go through, but it does not mention judicial review of BRA actions alleged not to conform to its requirements. Indeed, M.G.L. c. 121B as a whole contains no judicial review provision. Typically, where an administrative agency's enabling statute contains no judicial review provision, the Massachusetts Administrative Procedure Act ·("MAPA") supplies a default method of review. *See* M.G.L. c. 30A, § 14. However, MAPA review is unavailable for the decisions of a redevelopment authority because an authority is not an "agency" for the purposes of the MAPA, *Benevolent & Protective Order of Elks, Lodge No. 65 v. Planning Bd. of Lawrence* ("*Elks Lodge*"), 403 Mass. 531, 538, 531 N.E.2d 1233 (1988), and the hearings conducted for the approval of an urban renewal plan are not "adjudicatory proceedings" within the meaning of the statute, *Reid v. Acting Commissioner of the Department of Community Affairs*, 362 Mass. 136, 142–144, 284 N.E.2d 245 (1972).

■ This does not mean, however, that all BRA actions are unreviewable. Under Massachusetts law, a plaintiff has standing to sue if, among other things, he or she "can allege any injury within the area of concern of the statute or regulatory scheme under which the injurious action has occurred." *Elks Lodge*, 403 Mass. at 545, 531 N.E.2d 1233 (internal quotation marks omitted). Both the Boston City Council and the DCA arguably fall within the "area of concern" of § 48, for the statute requires the BRA to obtain their permission for the initiation of an urban renewal plan. However, the court need not decide whether these entities have standing to sue the BRA under § 48 because neither is a party to this litigation.

The question presented in this case is whether private citizens may sue under M.G.L. c. 121B, § 48. In *Elks Lodge*, the Supreme Judicial Court permitted a private plaintiff to sue the Lawrence Redevelopment Authority to challenge the Authority's decision to take the plaintiff's land for a M.G.L. c. 121B urban renewal project. 403 Mass. 531, 531 N.E.2d 1233 (1988). Noting the absence of an express review provision, the Supreme Judicial Court reasoned that:

> the legislative nature of the [Authority's] findings ... and the absence of a statutory requirement that the [DCA] explain its findings, *see* G.L. c. 121B, § 48, do not indicate a legislative intent to preclude review. These factors indicate a legislative scheme which provides for less rigorous judicial scrutiny, rather than no judicial scrutiny.

*Id.* at 537, 531 N.E.2d 1233 (some citations omitted). The Supreme Judicial Court pointed out that it has "consistently stated that courts may review the purpose for which land is taken," *id.* at 536, 531 N.E.2d 1233, and, therefore, allowed the plaintiff's lawsuit.

The case at bar differs from *Elks Lodge* in that the challenge, properly construed, is not

---

by the municipal officers and the department as provided in this section." M.G.L. c. 121B, § 48. The definitions section of the statute makes clear that "municipal officers" refers to "the city council with the approval of the mayor" and that "department" means the relevant "department of community affairs." *Id.* at § 1.

13. Plaintiffs, and *amicus* Boston City Council, also assert that the BRA acted without proper formal votes as it is required to do. Compl., at ¶ 70; Amicus, at 5. This contention does not require separate treatment because, as discussed *infra*, plaintiffs' challenge to the BRA's actions is time-barred.

to the initial taking of Area E, but to BRA decisions which plaintiffs allege result in improper *modifications* to the West End Plan approved in the 1950s.[14] The BRA contends that this difference is critical. *See* Tr. at 12. Arguably, because the legislature vested in the BRA "primary responsibility for ... supervising the *execution* of the plan," *Commissioner of the Dept. of Community Affairs v. Boston Redevelopment Authority*, 362 Mass. 602, 613, 289 N.E.2d 867 (1972) (*"DCA"*) (emphasis added), the BRA has more discretion concerning modifications to an urban renewal plan than to an initial taking.

■ However, it is not necessary to decide whether this distinction is material for standing purposes because even if plaintiffs had a private right of action, their complaint would be time-barred. When the Supreme Judicial Court has found an implied right of action in M.G.L. c. 121B, it has borrowed the relevant provision from M.G.L. c. 121A, which governs privately conducted "Urban Redevelopment Corporations". *See Boston Edison Co. v. Boston Redevelopment Authority*, 374 Mass. 37, 52–53, 371 N.E.2d 728 (1977); *Cumberland Farms, Inc. v. Montague Economic Development and Industrial Corp.*, 38 Mass.App.Ct. 615, 622, 650 N.E.2d 811 (1995).[15] The exclusive remedy for c. 121A plans is an action in the nature of *certiorari* which must be filed within thirty days of the decision causing the alleged injury. St.1960, c. 652, § 13. This provision shortens the standard sixty-day period in which actions in the nature of *certiorari* must normally be filed. *Compare* M.G.L. c. 249, § 4. Because

the period for seeking review of the last challenged BRA decision (the approval of the CRP condo-conversion in June 1995) expired more than a year before this action was filed in September 1996, plaintiffs' claims alleging a violation of § 48 are time-barred.[16]

The BRA correctly contends that the absence of judicial review at this time is not merely a "technical" point. BRA Mem., at 7. The limited window for judicial review of decisions concerning urban renewal projects "reflects a legislative determination that challenges to governmental proceedings [must] be sufficiently prompt so that neither the public body nor private parties working with it are in significantly changed positions when the attack on the underlying proceedings is made." *Cumberland Farms*, 38 Mass.App.Ct. at 623, 650 N.E.2d 811. In this case, the limited opportunity for review assures the "private redevelopers, and their lenders, contractors, [and] investors ... that once the thirty-day period to challenge actions has passed, they can commit their time and resources to completing the redevelopment process." BRA Mem., at 8. Accordingly, the court finds that the plaintiffs' claims under § 48 are time-barred.

In the interest of completeness, however, the court notes that even had plaintiffs brought suit in a timely fashion, it is unlikely they would have prevailed on the merits of their § 48 claim. The Supreme Judicial Court has held that Boston city Council approval is not necessary for modifications to the West End Plan. *DCA*, 362 Mass. at 613, 289 N.E.2d 867. Moreover, approval by the DCA is required only when changes to the

---

14. Even if the complaint could be viewed as challenging the taking of the land, plaintiffs would not satisfy the traditional injury-in-fact requirement of standing because Area E is not *their* land. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (stating injury-in-fact requirement).

15. The primary difference between c. 121A plans and c. 121B plans is that c. 121A plans are privately run. *Boston Edison*, 374 Mass. at 52–53, 371 N.E.2d 728. The Supreme Judicial Court in *Boston Edison* reasoned that the lack of "participation by public bodies" like the BRA in c. 121A plans militates in favor of greater judicial scrutiny of BRA action in c. 121A plans than in c.

121B plans. *Id.* (c. 121B plans governed by the arbitrary and capricious standard while c. 121A plans governed by substantial evidence test).

16. Plaintiffs contend that judicial review should be available under a "fundamental fairness" theory which they erroneously derive from *Palmer v. Rent Control Bd. of Brookline*, 7 Mass.App.Ct. 110, 115, 386 N.E.2d 1047 (1979). This contention is without merit. Not only was *Palmer's* discussion of fairness made in the context of the amount of process due in an administrative hearing, and not in the context of the availability of judicial review, but judicial review there was available pursuant to explicit statutory mandate. *See id.* at 114 n. 5, 386 N.E.2d 1047.

plan are "fundamental." *Id.* at 618, 289 N.E.2d 867. With regard to determining whether a change is "fundamental," the Supreme Judicial Court has instructed that:

> Any assessment of the magnitude of the ... revisions must be made with reference to the affected parcel. The plan has been developed as a comprehensive scheme for a Large, integrated area; even a change which totally altered one small parcel might have only a negligible effect on the overall nature of the development.

*Id.* at 619, 289 N.E.2d 867.

Plaintiffs' strongest argument on the issue of whether a fundamental change has occurred concerns the effect of the use of cooperatively owned, as opposed to rented, residential units at West End Place. Compl., ¶ 69; *see* Developer's Mem., at 17 (describing ownership structure). However, assuming without deciding that the West End Plan did not originally envision cooperative ownership, the court would still be likely to find that these changes were not "fundamental." The changes to Area E appear less drastic than those deemed not fundamental in *DCA* itself. *See* 362 Mass. at 619, 289 N.E.2d 867 (combining two parcels designated "public" and intended for a school with two parcels designated "residential" into a single parcel for residential and commercial use not a "fundamental" change). In addition, the case upon which plaintiffs rely, *Bronstein v. Prudential Ins. Co.*, 390 Mass. 701, 459 N.E.2d 772 (1984), which held that a change to cooperatives and condominiums was a fundamental change in a c. 121A plan, is distinguishable because the motivating rationale in that case—the effect of the change in ownership status of the units on existing tenants, id. at 711, 459 N.E.2d 772—is not present with regard to the units now being built at West End Place.

Furthermore, the court would be unlikely to accept plaintiffs' contention that an agreement between the BRA and CRP, which permitted the conversion of many existing CRP-owned apartments into condominiums in exchange for an easement from CRP for parking and delivery access next to West End Place, greatly broadens the extent of the condominium or cooperative-conversion.

Pl.'s Opposition, at 7. The impact of this agreement on the "affected parcel," *DCA*, 362 Mass. at 619, 289 N.E.2d 867, appears to be minor, merely designating a strip of land for parking space and delivery access. Consequently, if the issue were properly before it, the court would likely find that the modifications to the original West End Plan occasioned by the Lowell Square project were not "fundamental" changes necessitating DCA approval.

### C. *M.G.L. c. 121B, § 49 Does Not Provide Former West Enders With a Right to All New Units*

■ Plaintiffs also claim that displaced West End residents have a statutory right to preference in the assignment of all units at West End Place and, indeed, that this constitutes a property interest created by state law. While these claims are rooted in certain statutory language, when viewed in the context of the complete relevant statute and the applicable federal law, it is evident that these contentions are incorrect.

As plaintiffs understandably observe, M.G.L. c. 121B, § 49 does state *in part* that:

> If an urban renewal agency shall sell or lease any property acquired by it for an urban renewal project, the terms of such sales or leases shall obligate the purchasers or lessees ... (c) to give preference in the selection of tenants for dwelling units built in the project area to families displaced therefrom because of clearance and urban renewal activity who desire to live in such dwelling units and who will be able to pay [the required] rents.

This provision, however, is immediately followed by subsection (d), which states that purchasers or lessees of property acquired for an urban renewal project shall also be obligated:

> (d) to comply with such other conditions are deemed necessary to carry out this chapter, or requirements of federal legislation or regulations under which loans, grants or contributions have been made or

agreed to be made to meet a part of the cost of the project.[17]

Therefore, an ambiguity is created by the interaction of subsections (c) and (d) of M.G.L. c. 121B § 49. Subsection (c), if looked at in isolation, would in this case seem to grant an absolute preference to displaced West End residents, but subsection (d) requires conformity with federal law, which in this case does not permit such an unqualified preference.

■ The BRA interprets subsection (d) as qualifying and limiting the preference granted by subsection (c). *See, e.g.,* Tr. at 28; Developer's Mem., at 3. As the agency charged with administering the statute, its reasonable interpretation of legislative intent deserves some deference from the court. *See National Railroad Passenger Corp. v. Boston and Maine Corp.,* 503 U.S. 407, 417–418, 112 S.Ct. 1394, 1401–02, 118 L.Ed.2d 52 (1992)(citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *Conservation Law Foundation v. Federal Highway Administration,* 24 F.3d 1465, 1480 (1st Cir.1994); *see also Nuclear Metals, Inc. v. Low–Level Radioactive Waste Management Board,* 421 Mass. 196, 211, 656 N.E.2d 563 (1995); *Manning v. Boston Redevelopment Authority,* 400 Mass. 444, 453, 509 N.E.2d 1173 (1987)). However, because the BRA's interpretation of § 49 is informal, having been expressed in litigation rather than through rulemaking or adjudication, it does not merit full *Chevron* deference from the court. *See Commonwealth of Massachusetts v. Federal Deposit Insurance Corporation,* 102 F.3d 615, 621–22 (1st Cir.1996). In any event, in this case the degree of deference due to the BRA's interpretation of § 49 is immaterial because its view of the statute is not only reasonable, it is right.

As described earlier, the development of West End Place is in part federally funded. The federal Fair Housing law, 42 U.S.C. § 3601 *et seq.,* explicitly applies to such projects. 42 U.S.C. § 3603(a)(1)(B). This law provides, among other things, that: "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.

This means, among other things, that it is unlawful to discriminate against any person in the sale or rental of a federally funded dwelling based on race. 42 U.S.C. § 3604(b). As Justice Stephen Breyer, then writing for the First Circuit, recognized in 1987, the ending of discrimination is intended to be a "means toward truly opening the nation's housing stock to persons of every race and creed." *N.A.A.C.P. v. Secretary of Housing and Urban Development,* 817 F.2d 149, 155 (1st Cir.1987). Thus, the federal Fair Housing law "reflects the desire to have HUD use its grant programs to assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases." *Id.*

Accordingly, there is now a statutory mandate that all federal agencies administer their programs "in a manner affirmatively to further" the purpose of the Fair Housing law. 42 U.S.C. § 3608(d). HUD has addressed its affirmative duties in regulations promulgated pursuant to the authority of this statute. Those regulations state in part:

It is the policy of the Department to administer its FHA housing programs affirmatively, as to achieve a condition in which individuals of similar income levels in the same housing market area have a like range of housing choices available to them regardless of their race [or] color.... Each applicant for participation in FHA subsidized and unsubsidized housing programs shall pursue affirmative fair housing marketing policies in soliciting buyers and tenants, in determining their eligibility, and in concluding sales and rental transactions.

24 C.F.R. § 200.610 (1996). These regulations have the same force as statutes under

---

17. At the time of the original sale to CRP, a predecessor statute, M.G.L. c. 121, § 26LL, applied. In contrast to M.G.L. c. 121B § 49(d), Section 26LL(d) referred only to federal "legislation," rather than to federal "legislation or regulations." In view of the currently applicable federal legislation, described *infra,* this distinction between the two statutory provisions is immaterial.

the Supremacy Clause of the Constitution. *See City of New York v. F.C.C.*, 486 U.S. 57, 63, 108 S.Ct. 1637, 1641–42, 100 L.Ed.2d 48 (1988). Thus, federal law ordinarily requires the sort affirmative fair housing marketing policy aimed at attracting minority applicants that is being employed at West End Place. This requirement is reiterated in the *Kemp* Consent Decree concerning federally funded projects in the City of Boston.

It would obviously be a charade to affirmatively market the units at West End Place to attract minority applicants and then give former West End residents an absolute preference to all of those units because the vast majority of them are white. In any event, the federal government could not legally, and as a practical matter would not, contribute to the project in the absence of a meaningful plan to market the units affirmatively to minorities. *See, e.g.,* Gibbs Decl., ¶ 15. Thus, ironically, if plaintiffs were correct in contending that § 49 creates an enforceable right that former West End residents be assigned all of the units, it appears that vital federal funding would be forfeited, West End Place would not be constructed, and the opportunity it will afford for a meaningful number of former residents to return to the West End will be lost.

Section 49 does not, however, require this result. Subsection (d) expressly requires that urban renewal projects comply with the requirements of the federal law relating to federal funding. The BRA has given effect to both subsections (c) and (d) by requiring the Developer Defendants to affirmatively seek minority applicants while also recruiting former West End residents and reserving many of the units solely for them. Thus, the BRA has construed the statute in a manner consistent with its language, common sense, and the requirements of federal law.

If, however, the BRA instead interpreted § 49(c) as intending to give an absolute preference to former West End residents, it would still be obliged to obey the federal law and would have the power to modify that

absolute preference. Under Article VI, Clause 2 of the Constitution, the laws of the United States are the "Supreme law of the land, binding on every citizen and every court and enforceable whenever jurisdiction is adequate for the purpose." *Miles v. Illinois Central R. Co.*, 315 U.S. 698, 703–04, 62 S.Ct. 827, 830, 86 L.Ed. 1129 (1942). Consistent with this, as then Judge Breyer wrote, "a Housing Authority might even ignore its own regulations giving assignment priority in urban development projects to former site residents if it is convinced that doing so is the only way to prevent a ghettoization of the area." *N.A.A.C.P.*, 817 F.2d at 155; *see also United States v. City of Parma*, 504 F.Supp. 913, 920 (N.D.Ohio 1980) ("[W]here ordinances such as the one at issue have been found to thwart equal housing opportunity, such ordinances must give way to the dictates of federal policy."), *aff'd in part and rev'd in part,* 661 F.2d 562 (6th cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982); *Otero v. New York City Housing Authority,* 484 F.2d 1122, 1135 (2d Cir.1973)("To the extent that the regulation [regarding tenant preferences] conflicts with the Authority's duty to integrate, the regulation must yield."). As § 49(d), however, expressly contemplates that the statute will be administered in a manner consistent with federal law, reliance on the Supremacy Clause to resolve the instant case is not necessary.

Accordingly, the court concludes that the BRA properly construed § 49 in interpreting it in this case as creating a preference for former West End residents which is qualified by the requirements of federal law.[18] Therefore, Count I must be dismissed.

### 1. *M.G.L. C. 121B, § 49 Does Not Create a Trust*

Count II alleges that § 49 has the effect of creating a trust for the benefit of people displaced by urban renewal. This claim too is incorrect. Massachusetts law requires three elements to create an express trust: an intent to create a trust; a clearly

---

**18.** Indeed, plaintiff OWEHC evidently understood that federal law limited the preference which could be given to former West End residents when it entered into its Participation Agreement with LSA, which provides that such preference will be subject to "application ... federal laws." Participation Agreement, Pl.'s P/I Mem., Exhibit K, at 7.

identifiable trust *res;* and identifiable beneficiaries. *Curran v. LeRoux,* 157 B.R. 500, 509 (Bankr.D.Mass.1993); *Doucette v. Kwiat (In re Kwiat),* 62 B.R. 818, 821 (Bankr. D.Mass.1986), *modified on other grounds sub. nom. Kwiat v. Doucette,* 81 B.R. 184 (D.Mass.1987). Plaintiffs do not satisfy the first two of these requirements.

■ First, "[b]ecause the creation of an express trust depends on the intention of the parties, an express trust can never be created by statute alone." *BAMCO 18 v. Reeves (In re Reeves),* 124 B.R. 5, 11 (Bankr.D.N.H. 1990). Plaintiffs do not allege, however, that anything outside of § 49 manifests a legislative intent to establish a trust for former West End residents.

■ Second, it is well-settled in Massachusetts law that "an interest which has not come into existence cannot be held in trust." *New England Trust Co. v. Sanger,* 337 Mass. 342, 348, 149 N.E.2d 598 (1958). Plaintiffs assert that the trust came into existence at the time the BRA took title—the land by eminent domain. Compl., at ¶ 90. Whether this was in 1960 or 1994, defendants correctly observe that "[a] number of events would have to occur *subsequent* to the BRA's taking of the land before the [statutory] preference would become operable and before the actual *res* would come into existence." BRA Reply, at 9. Those events include the sale of the land to a developer, the wholly discretionary decision to devote the land to residential use, and the actual construction of the buildings. *Id.*

Accordingly, Count II is being dismissed.

**D.** *Plaintiffs' § 1983 Allegations Fail to State a Claim on Which Relief Can Be Granted*

1. *Plaintiffs Do Not Have a Right to Due Process in the Allocation of Units*

Counts III and IV seek relief under 42 U.S.C. § 1983. In order to state a claim for

relief under § 1983, a plaintiff must first show that he or she has "been deprived of a right 'secured by the Constitution and the laws' of the United States," and second, that the defendants deprived them of that right while acting under the color of state law. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978).

■ Plaintiffs claim, in part, that they are being deprived of their property without due process. Compl., ¶¶ 96, 101. The property interests protected by the Due Process Clauses of the Fifth and Fourteenth Amendments do not derive from the Constitution itself, but from an independent source such as state law. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *see also Lowe v. Scott,* 959 F.2d 323, 334 (1st Cir. 1992). As explained previously, § 49 does not create a property right to an absolute housing preference for former residents of the West End.[19] Thus, plaintiffs do not have a constitutional right to due process regarding the allocation of units at West End Place. Therefore, those portions of Counts III and IV which seek relief for a failure to afford due process are being dismissed.

2. *Plaintiffs Have Not Adequately Alleged a Denial of Equal Protection*

■ Although not clearly articulated, Count III of the complaint also alleges that the BRA (but not the other defendants) violated plaintiffs' Fourteenth Amendment right to equal protection of the laws. It states that the BRA:

By applying the Consent Decree of March 8, 1991, to the tenant selection process at West End Place *thereby depriving the Plaintiffs of a benefit on the basis of racial classifications;* [sic] interfered with, denied, and deprived the plaintiffs of their ... equal protection rights contrary to the

---

**19.** In addition, as described previously, in this case there are far more former West End residents who have applied for low and moderate-

income units at West End Place than total units. It is evident that they could not all have a property right to a unit.

Fifth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. Sec.1983.

Compl., ¶ 101 (emphasis added).[20] It is clear that the reference to the Consent Decree refers to the AFHMP required by that Order, as well as by otherwise applicable federal law. Consequently, the essence of their allegation is that the AFHMP prescribes discrimination against plaintiffs in the allocation of a "benefit" based upon their race.

Plaintiffs, however, have failed to allege a viable equal protection claim for two reasons. First, their allegations are merely conclusory and fatally fail to allege, let alone set forth facts showing, the intent to injure the plaintiff class that is required to establish an equal protection violation. *See, e.g., Coyne v. City of Somerville,* 972 F.2d 440, 442 (1st Cir.1992). Second, the AFHMP as written only employs race with regard to the recruitment of applicants. Units are to be assigned in a color-blind fashion. Thus, if administered as written, the AFHMP would not deprive plaintiffs, because of their race, of any "benefit" subject to equal protection analysis. *See, e.g., Shuford v. Alabama State Bd. of Educ.,* 897 F.Supp. 1535, 1553 (M.D.Ala.1995).

With regard to the adequacy of the Complaint:

> [P]laintiffs are obliged to set forth in their complaint factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory. The need is perhaps greater where allegations of civil rights violations lie at the suit's core.

*The Dartmouth Review,* 889 F.2d at 16. "Proof of a racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). This means that it must be alleged, and then shown, that a decisionmaker "selected or re-affirmed a particular course of action at least in part 'because of' and not merely 'in spite of' its

adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979); *see also Coyne,* 972 F.2d at 445.

The Complaint in this case does not allege the required discriminatory animus. This is material because " '[d]espite the highly deferential reading ... [courts] accord a litigant's complaint under Rule 12(b)(6), [courts] need not credit bald assertions ... (or) unsubstantiated conclusions ...'" *Coyne,* 972 F.2d at 444 (quoting *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 53 (1st Cir. 1990)). Rather, where, as here, plaintiffs "do not allege, and on the basis of pleaded facts cannot prove," the required discriminatory purpose, equal protection claims are properly dismissed. *Id.* at 445.

If this were the only defect in plaintiffs' equal protection claim, the court might afford them an opportunity to amend their complaint. There is, however, a more fundamental flaw in plaintiffs' theory.

Contrary to their contention, the AFHMP does not use race as a factor in allocating any "benefit." Nor does the AFHMP provide any "preference" in the assignment of units at West End Place based on race. Indeed, ironically, the only group preference is given to former West End residents who are overwhelmingly white. Thus, plaintiffs do not, and cannot, allege that the AFHMP as written "single[s] them out for unlawful oppression." *The Dartmouth Review,* 889 F.2d at 19.

These conclusions derive from the equal protection jurisprudence developed following the Supreme Court's decision in *City of Richmond v. J.A. Croson. Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), the principles of which now apply to federal programs as a result of the Court's subsequent decision in *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

*Adarand* was a case brought by a contractor who lost a guard rail subcontract on a

---

**20.** The Fifth Amendment is not applicable because Count III pertains only to the BRA, rather than to the Federal Defendants.

federally funded highway project to a competitor who was designated by the United States Small Business Administration as "disadvantaged" because of his race. 515 U.S. at —— – ——, 115 S.Ct. at 2102–04. The question in *Adarand* was whether this federal racial preference would be subject to the strict scrutiny that the Supreme Court had found in *Croson* to be applicable to such preferences when they are created by state or local law.

More specifically, as explained by the Supreme Court in *Adarand, Croson* established that " 'any [state or local] *preference* based on racial or ethnic criteria must necessarily' " be subject to strict scrutiny and " 'the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefitted by a particular classification.' " 515 U.S. at ——, 115 S.Ct. at 2111 (quoting *Croson*, 488 U.S. at 494, 109 S.Ct. at 722)(emphasis added). Subsequently, however, in *Metro Broadcasting, Inc. v. F.C.C.*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), the Supreme Court suggested that " 'benign' federal racial classifications need only satisfy intermediate scrutiny." *Id.* at ——, 115 S.Ct. at 2112. The primary purpose and effect of *Adarand* was to clarify that the constitutional standards enunciated in *Croson* for the evaluation of racial preferences established by state or local law are equally applicable to federal law. *See id.* at —— – ——, 115 S.Ct. at 2115–17; *id.* at —— – ——, 115 S.Ct. at 2123–24 (Stevens, J. dissenting)

Plaintiffs here seem to suggest that the AFHMP for West End Place must be subject to strict scrutiny and that it cannot, as that test requires, be proven that the Plan is narrowly tailored to serve a compelling state interest, *id.* at ——, 115 S.Ct. at 2113—in this case remediating proven past discrimination.

█ Following *Croson*, however, similar affirmative marketing, outreach, and recruitment programs directed at minorities have been characterized as "race neutral" and have not been subject to strict scrutiny analysis. *See Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1571 (11th Cir.1994) (labelling various minority recruitment and application fee waivers "race-neutral"); *Peightal v. Metropolitan Dade County*, 26 F.3d 1545, 1557–58 (11th Cir.1994) (describing minority outreach and recruitment programs for firefighting positions as "race-neutral"); *Billish v. City of Chicago*, 962 F.2d 1269, 1290 (7th Cir.1992) (same), *rev'd on other grounds*, 989 F.2d 890 (7th Cir. 1993) *(en banc); Cf. South–Suburban Housing Center v. Greater South Suburban Bd. of Realtors*, 935 F.2d 868, 883–84 (7th Cir. 1991)(short of concrete evidence of steering away of people who would otherwise apply, AFHMP not violative of Title VIII), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992); *Alschuler v. HUD*, 515 F.Supp. 1212, 1234 (N.D.Ill.1981) (noting that "the purpose of the AFHMP is not to guarantee racial quotas or racially integrated projects ... [but] to ensure that all racial groups in a marketing area have knowledge of and an opportunity to rent units in a particular building."), *aff'd*, 686 F.2d 472 (7th Cir.1982); *see also* Robert G. Schwemm, *Housing Discrimination: Law and Litigation* § 11.2(2), at 11–11 n. 51 (listing other cases) & 11–27.

Although the affirmative recruitment of minority applicants is race-conscious conduct, as a recent decision from the Middle District of Alabama has cogently explained, such conduct alone does not constitute a "preference" within the meaning of *Croson* and *Adarand* that is subject to strict scrutiny because: "The crucial distinction is between expanding the applicant pool and actually selecting from that pool. Expanding the pool is an inclusive act. Exclusion (based on race) .... can only occur at the selection stage." *Shuford*, 897 F.Supp. at 1553. Consistent with this analysis, the United States Department of Justice has expressed the view that: "Mere outreach and recruitment efforts ... typically should not be subject to the *Adarand* standards." *Department of Justice: Memorandum on Supreme Court's Adarand Decision*, [June 28, 1995] Fair Empl. Prac. Cas. (BNA) 405:221, at 405:226 (May 1996)("*DOJ Memo*"). The court finds this reasoning persuasive and concludes that the

West End Place AFHMP is not subject to strict scrutiny under *Adarand*.[21]

The court recognizes, however, that it is possible that a facially permissible outreach effort might operate in an illegally exclusionary manner. *See South–Suburban Housing Center*, 935 F.2d at 883, 897 *Shuford*, 897 F.Supp. at 1553; *DOJ Memo* at 405:226 n. 13. For example, outreach and recruitment efforts might be so intense and focused as to create a pool of minority applicants only, or interested white applicants might be steered away from applying by the developer. However, as the Seventh Circuit has said, "[i]n the absence of concrete evidence" that the APHMP is being manipulated to provide a preference to minorities, there is "nothing wrong with . . . attempting to attract [minorities] to housing opportunities they might not ordinarily know about and thus choose to pursue." *South–Suburban Housing Center*, 935 F.2d at 884.

In this case, it does not appear that plaintiffs allege that defendants are deviating from the AFHMP. However, when asked at the November 20, 1996 hearing whether there was additional discovery perceived to be necessary for the motion to dismiss to be fairly treated as one for summary judgment, plaintiffs' counsel identified discovery concerning the manner in which units were actually being assigned as the only issue. Tr. at 66–67.

Therefore, while the court is dismissing plaintiffs' equal protection challenge on the basis of the AFHNP, and tenant selection process it includes, as written, it is not clear whether this should result in the dismissal of this case without prejudice to a filing of a new action if plaintiffs later discover a proper basis, under Fed. R. Civ. P. 11, to allege that the AFHMP is intended to operate, and is actually operating, in an illegally discriminatory manner, or whether an amended complaint and discovery to address this issue in this case are appropriate. Accordingly, the court will afford the parties an opportunity to confer and to inform the court: (a) whether they have reached some agreement to resolve the issue and, if not; (b) of their respective positions concerning it.

### E. *Counts V and VI Fail to Allege Viable Title VI and Title VIII Claims*

Counts VI and V respectively allege that all defendants violated Title VI of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000d, and Title VIII of the Civil Rights Act of 1968 as amended, 42 U.S.C. § 3604. Each of these counts fails to state a claim upon which relief can be granted.

■ Count VI asserts that defendants violated Title VI by, among other things, "denying Plaintiffs benefits, and subjecting them to racial discrimination under a program receiving Federal financial assistance." Compl., ¶ 109.[22] As described previously, the AFHMP, including its tenant selection process, does not grant or deny any "benefit" based in whole or in part on race. Moreover, plaintiffs again have failed to plead the specific discriminatory intent required to establish a violation of Title VI. *See Latinos Unidos De Chelsea En Accion v. Secretary of H.U.D.*, 799 F.2d 774, 783 (1st Cir.1986)("To prevail with a direct claim under [Title VI], plaintiffs must show that defendants acted with discriminatory intent.").

As indicated earlier, the Court of Appeals for the First Circuit has:

consistently required plaintiffs to outline facts sufficient to convey specific instances of unlawful discrimination. . . .

. . . It is only when . . . conclusions are logically compelled, or at least supported, by the stated facts, that is, when the inference rises to what experience indicates is an acceptable level of probability, that "conclusions" become "facts" for pleading purposes.

*The Dartmouth Review*, 889 F.2d at 16.

The facts alleged in the Complaint, including the terms of the AFHMP to which it

---

**21.** In view of the *Kemp* litigation and Consent Decree the AFHMP might survive strict scrutiny, but the court need not now decide this question.

**22.** The statute states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

refers, would not if proven permit a finding of discriminatory intent. The Developer Defendants were responding to the requirements of federal law in adopting the AFHMP. More significantly, that Plan includes a special waiver from HUD permitting the BRA and the developer to set aside 55% of the units at West End Place for the overwhelmingly white former West End residents. Thus, the AFHMP plainly provides plaintiffs a preference rather than discriminating against them based on race. Therefore, they have not stated a viable Title VI claim with regard to the AFHMP as it is written.

Plaintiffs also fail to allege a sufficient Title VIII claim. Title VIII prohibits discrimination in the "terms, conditions and privileges in the sale or rental of a dwelling, or in the provision of services or facilities in connection therewith ..." 42 U.S.C. § 3604(b). In order to state a cause of action under this statute, plaintiffs need not allege discriminatory intent, but must at least allege some "practice" which "results in a disproportionate burden on members of a class protected by Title VIII." *Casa Marie, Inc. v. Superior Court of Puerto Rico,* 988 F.2d 252, 269 n. 20 (1st Cir.1993). Generally, such disparate impact is illustrated through statistical evidence. *See Mountain Side Mobile Estates Partnership v. Secretary of HUD,* 56 F.3d 1243, 1251–52 (10th Cir.1995). All that plaintiffs have alleged in this case, however, is that the "appl[ication]" of the AFHMP results in racial discrimination. Compl., ¶ 107. There is, for example, no allegation that white people are being discouraged from applying for units at West End Place. *Compare South–Suburban Housing Center,* 935 F.2d at 883–84. Indeed, once again, it is undisputed that white people who formerly resided in the West End are, under the AFHMP, being affirmatively recruited and will be given preference in the assignment of many units.

As with the equal protection claim, it is possible that any deviations from the AFHMP might provide a proper basis for a Title VI or Title VIII claim. This question, however, is not now properly presented. Therefore, like the equal protection claim,

the Title VI and Title VIII claims will be dismissed without prejudice to a possible motion to amend the complaint, if there is now a proper basis to do so under Fed. R. Civ. P. 11, or to the filing of a new case in the future if the evolution of events provides a proper basis to do so.

## V. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Plaintiffs' claims under the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, and Title VIII of the Civil Rights Act of 1968 are DISMISSED without prejudice to the possible filing of a motion to amend the complaint or the filing of a new case to assert that there has been, or will be, conduct which deviates from the West End Place Affirmative. Fair Housing Marketing Plan as written and which violates any of these provisions. The remaining claims are DISMISSED with prejudice.

2. Judgment shall not enter immediately. Counsel for the parties shall confer and inform the court by January 31, 1997, whether plaintiffs wish to file a motion to amend the complaint aimed at curing the deficiencies in their equal protection, Title VI and Title VIII claims.

3. This case is otherwise hereby STAYED.